## R. B. HARRIS v. R. B. McKISSACK.

1. LAND LAWS : PATENT, EVIDENCE OF LAWFUL AUTHORITY TO ISSUE IT.—A patent for land issued by the General Government, is evidence of the existence and due performance of all the conditions upon which its issuance depended ; and hence, a patent issued to a Chickasaw Indian, under the provisions of the Treaty of 1834, is evidence, that the patentee was entitled to a reservation under the eighth article of the treaty, and that the land had been regularly surveyed and located for his benefit.

2. SAME : SALE OF CHICKASAW RESERVATIONS, PRESUMPTION IN FAVOR.—It will not be presumed, in the absence of all proof on the subject,.that a minor, to whom land was reserved under the eighth article of the Treaty of 1834, with the Chickasaw Indians, had arrived at full age in 1854, so as to avoid a sale then made by the President of the land so reserved.

3. SAME : CHICKASAW RESERVATIONS : SALES OF, IN VIOLATION OF THE PRESI-DENT'S DIRECTIONS, VOID.—The President of the United States, by the express terms of the Treaty of 1834 with the Chickasaws, was vested with authority,

upon the recommendation of a majority of the chiefs, designated under the fourth article of the treaty, to order a sale of the lands reserved under the eighth article ; and also to designate the time and place, mode and manner of the sale; and his directions on this subject constitute the law, to which not only the subordinate officers must conform in making a sale, but they are also binding on the President : and hence, where the land of a reserve was sold in larger quantities and at a lower price than was authorized by the President's instructions, the sale is absolutely void, notwithstanding his subsequent approval of it.

4. CONTRACT : WHEN ABSOLUTELY VOID, CANNOT BE RATIFIED.—An act which is void in itself, cannot be made valid by any subsequent matter.

IN error from the Circuit Court of De Soto county. Hon. P. T. Scruggs, judge.

*Thos. W. Harris*, for plaintiff in error.

[No memorandum of Mr. Harris's brief has come to the possession of the Reporter.]

*H. W. Walter*, for defendant in error.

A party plaintiff in ejectment must show a perfect title in himself against all others, unless defendant entered or claims under him. *McRaven* v. *McGuire*, 9 S. & M. 34. Defendant in the case at bar did not claim under plaintiff, and has had no connection with him as to the land. Plaintiff must show a perfect title in himself. The first step which he took in the case was to introduce a patent, vesting the title to the land in the Indian, Yuck-ah-she-ko. This patent is dated 17th March, 1855, six months after the commencement of plaintiff's suit. No conveyance is shown from Yuck-ah-she-ko to appellee. A patent is evidence that all preliminary steps have been taken to justify its issuance, and is a legal title. *Surgett* v. *Little*, 24 Miss. R. 118 ; *Dickinson* v. *Brown*, 9 S. & M. 130. Appellee himself introduced proof before the jury that the legal title was in another, and the jury should have found for defendant. The court, in refusing a new trial, erred.

Appellee, in the court below, introduced a certificate of sale of this land by the register and receiver, dated in March, 1854, to him, and insisted that it was a legal title under our statute, which provides, that " all certificates issued in pursuance of *any act of Congress*, by any Board of Commissioners or Register of a land

Harris *v.* McKissack.

office," &c. &c., is a legal title so far as to enable the holder to maintain an action thereon. But this court held, in *Dickinson* v. *Brown,* 9 S. & M. 130, that this statute makes the certificate but a substitute for a better title, and is not on an equal footing with a patent, and the patent is a superior title to the certificate. The appellee introduced this very patent, showing a superior title in another.

But the appellee was unfortunate in introducing the instructions of the War Department of 1836, which directs that these orphan reservations *shall not be sold for less than five dollars per acre.* Without the introduction of these instructions, the law might presume that the sale of the land could be presumed *to be* correct; but the appellee has introduced the very testimony that shows that the register and receiver were violating their very power of attorney, and the authority under which they were acting. In addition to this, the evidence introduced by appellee below shows that publication of the time and place of sale were required, but does not show that the publication was made.

Again, the instructions from the War Department directed the sale of the land in quarter sections, and yet, in direct violation of these instructions, the receiver sold the whole half section. It will be remembered that all this proof is introduced by appellee, and in introducing it, he shows that the party from whom he purchased a half section at three dollars per acre, only had authority to sell in quarter sections at five dollars per acre. In this point of view, the court erred in not excluding the testimony from the jury; and the jury erred in finding for the appellee.

Again, appellee had no legal title in himself at the time the suit was brought, and this court has decided, in *Laurisini* v. *Corquette,* 25 Miss. R. 177, that he must have the legal title at the commencement of the action. The court erred in admitting this testimony, and the jury equally erred in finding a verdict on it. But appellee may say that our statute declares that all certificates issuing under any *acts of Congress,* &c., shall be a legal title sufficient to institute an action for the recovery of land. We insist that the appellee shall be confined to the law as it is written, and this certificate of sale is not one of those issuing under an *act of Congress.* If issued in accordance with any law or authority whatever, it was by virtue

of the Chickasaw Treaty, and not by a law of Congress. Under this view of the subject, appellee had no legal title to the land when the suit was commenced, had no certificate issuing under any law of Congress, and was not entitled to his verdict. In addition to this, his certificate was not approved until March, 1855, six months after the commencement of his suit, and that certificate could have no validity until approved by the President, especially when the sale was made in direct violation of the law governing the sale, both as it respected the quantity of land sold and the price paid. This approval by the President was absolutely necessary under the eighth article of the treaty with the Indians.

Again, the eighth article of the treaty (7 U. S. Statutes, 453) provides only for the sale of the lands of minors under twenty-one years. This treaty was made in 1834, and the lands were sold in 1854. The presumption of law was that Yuck-ah-she-ko was then twenty-one years old. It is certain that if he had been born in 1834, he would have been twenty-one at the time the President approved the sale. We respectfully submit to this court, that the sale could not have been made after the Indian attained majority, but that his land would of necessity have to be sold under the fifth article of the treaty, as that of any other Indian. As long as he was a minor, the Government stood him in lieu of experience and judgment; but as soon as he attained majority, experience, and ability, the treaty demanded for him, the same right to dispose of his lands that others of his nation possessed. This construction of the treaty is respectfully submitted; and if we are right in this, then the appellee had no title whatever, and the court below erred in refusing a new trial.

SMITH, C. J., delivered the opinion of the court.

This was an action of ejectment to recover the possession of certain land, brought by the appellee against the appellant.

On the trial below, the plaintiff proved the possession of the defendant at the time of the commencement of the suit. He then offered in evidence a patent from the United States to Yuck-ah-she-ko for the land in contest, dated March 17th, 1855. He next offered a certified copy of the recommendation of a majority of the chiefs designated in the fourth article of the Treaty of 1834 with

the Chickasaws, advising an immediate sale of the lands reserved under the eighth article of said treaty; and also extracts from a letter addressed by the Commissioner of Indian Affairs to the Commissioner of the General Land Office, in which it was stated that a copy of a list of locations of reservations under the eighth article, approved by the President, was therewith transmitted. And that a majority of the persons mentioned in the fourth article of the treaty, having recommended an immediate sale of those reservations, the President had directed that they should be brought without delay into market, on the following terms: "The Register and Receiver of Chickasaw lands will advertise in three or four newspapers of the neighborhood, that these lands will be sold at Pontatoe, at public auction, in quarter sections, for gold or silver, sixty or ninety days' notice of the time and place of sale, and the terms, to be given," &c. And that "it is the opinion of the President that they ought to bring five dollars per acre, and the Register and Receiver will fix this as a *minimum*, below which they must not be sold." The plaintiff further offered to read the original and a certified copy of the same, of a sale to him, made by the Register and Receiver at Pontotoc, of the land reserved to Yuck-ah-she-ko, at three dollars per acre. The certificate bears date the 1st of March, 1854.

The appellant objected to the reading of these several documents, but his objections were overruled, and they were read to the jury. Whereupon he excepted.

With the exception of the testimony in relation to the possession, these documents were the only evidence adduced by either party. And the jury having returned a verdict for the appellee, a motion for a new trial was made, which was overruled.

Without noticing the exceptions taken to the admission of improper evidence, we shall direct our attention to the main question; that is, whether the evidence established title in the appellee.

A patent is evidence of the existence and due performance of all the conditions upon which its issuance depended. Hence, the patent of the 17th of March, 1855, raised the presumption that the patentee was entitled to a reservation under the terms of the eighth article of the treaty, and that the land patented was regularly located and surveyed. It imported a perfect legal title in Yuck-

ah-she-ko; and as it issued subsequent to the institution of the action, it was no evidence whatever that the appellee then held the legal title; and, of itself, was no proof that the title was in him when the cause was tried.

The rights of that class of persons to which the patentee belonged, depended exclusively on the stipulations of the treaty. The title, at least the beneficial ownership to the lands, reserved by the eighth article of the treaty, never attached in the United States. They were reserved and appropriated by the treaty itself. But conceding that it was a right, and the consequent duty of the Government to issue patents to the individuals entitled to reservations, and that the patents would be evidence of title, if it were admitted that the sale of the land made by the register and receiver to the appellee, was valid and effectual to pass the title of Yuck-ah-she-ko, the patent which subsequently issued to him would be simply void. This is clear; for supposing that the patent bore date prior to the sale by the register and receiver, and assuming that that sale was valid, no doubt can be entertained that the purchaser acquired a title which would prevail against the patent. In other words, the purchaser got the title of the patentee. We may, therefore, leave out of view the patent, as it constituted no impediment to a recovery.

The question must turn exclusively on the sale by the register and receiver. And in reference to this subject, two grounds are taken by the appellant's counsel.

1. It is said that the right on the part of the President to order a sale of the reservations, provided for in the eighth article of the treaty, existed only during the minority of the parties entitled to reservations. And that it is fairly to be inferred that the reservee in this instance, was of the age of majority when the sale was made. Hence the sale was void.

2. That the sale was made in violation of the express directions given by the President to the register and receiver; and hence, was without authority, and void.

1. There is no ground upon which any conclusion can be based in regard to the age of the reservee, at the date of the sale of his land, except the necessarily presumed fact, that he was in existence when the treaty was made; that is, on the 24th of May, 1834.

He was then living, and if not more than fourteen months old, had not attained his age of majority when the land was sold.  If in fact he was then of full age, it was incumbent upon the appellant, who contested the validity of the sale, to prove it.  In the absence of any proof on the subject, upon a principle invariably applied in such cases, we are bound to presume that he was a minor, and consequently, in this respect, to uphold the regularity of the sale.  It is true, as contended by counsel, that the approval of the President was essential to the validity of the sale.  But it is also true that the approval would relate back to the date of the sale, which, if then regular and valid, would not be rendered void by the non-approval of the President, before the party attained his age of majority.

Although we agree with counsel, that the treaty contemplated the speedy sale of the lands reserved and located under the eighth article, if the parties designated should deem a sale advisable; and that the power of the President over the subject of such sale, terminated with the minority of the persons entitled to the reservations, for the reasons above assigned, we think this objection is untenable.

2. The treaty, in express terms, vested the authority in the President, upon a recommendation to that effect of a majority of the persons designated in the fourth article, to order a sale of the lands reserved under the eighth article.  He had full power to designate the time and place, the mode and manner, and to prescribe the terms of the sale.  In the letter of instructions transmitted to the register and receiver at Pontatoe, minute and specific directions were given on all these points.  Those directions were the law to which they were bound to conform, and the sole foundation of their authority in regard to the sale.  The Government had no beneficial interest in the lands.  The President possessed a naked power, necessarily limited by the objects of the trust.  And the subordinate officers of the Government, whose agency was required in carrying into effect those objects, were bound to a rigid compliance with the instructions from which they derived their authority to act.

The record contains no evidence that the land in question was ever advertised for sale, or that the sale was made at public auction, as required by the instructions.  This, however, was unimportant, as these facts would be presumed.  But it appears affirmatively,

from the record, that the instructions were violated in two important and material respects. 1. The land was not sold by quarter sections, but *in solido*. 2. The land was sold at three dollars per acre; whereas, the *minimum* price was, peremptorily, fixed at five dollars per acre.

The appellee cannot claim to stand in the attitude of a *bonâ fide* purchaser without notice. He knew that the land in question was a reservation under the eighth article of the Chickasaw Treaty; and was presumed to know the authority under which the register and receiver claimed to act. It is scarcely necessary to say that, under these circumstances, as the sale was illegal and void, the appellee did not acquire even an equity, in virtue of the sale. And it only remains to be seen whether the subsequent approval by the President, gave to it validity and efficacy.

It is clear, from the express terms of the treaty, that, if deemed advisable by the chiefs and the President, an immediate sale of this class of reservations was contemplated. In selling those lands, the interests of the reservees was the subject, exclusively, to be attended to. The President thought that an immediate sale was expedient, and ordered them to be brought into market without delay. Near twenty years had elapsed from the date of the order to the time when the sale took place. Of necessity, very few of those living who were entitled to lands under the eighth article of the treaty were minors in 1854. Their condition must have changed. What was highly beneficial for them in 1834, might have been extremely prejudicial in 1854. The propriety and legality of the sale in question was, therefore, at the best, questionable. But, disregarding this consideration, we think that the approval did not confer validity upon the sale.

The chiefs advised an immediate disposition of the reservations, and the President concurring with them, gave directions accordingly to the register and receiver, and laid down the terms upon which they were to be sold. His act, thus far, was an execution of the power vested in him by the treaty. And without asserting, that having ordered the reservations to be sold, and prescribed the terms, his authority was at an end, it may be safely assumed that the terms prescribed, until modified by him, were as much the law for his government as that of his subordinates. Neither the Govern-

ment nor the President was the legal or beneficial owner of these lands. The President's authority was a mere naked power to dispose of the title of others for their benefit. His approval, therefore, of the sale cannot operate by way of estoppel upon the rights of the appellant. And, holding as we do, that the sale was illegal and void, the maxim applies, fully, that an act which is void in itself cannot be made valid by matter subsequent.

Judgment reversed, and cause remanded.