George J. Gibson *v.* Western New York & Pennsylvania R. R., Appellant.

*Negligence—Railroads—Evidence—Release.*

In an action against a railroad company to recover damages for personal injuries, defendant set up as a defence a release executed by plaintiff. Plaintiff swore that the release was executed when he was under the influence of anæsthetics, and positively denied the exercise of any mental faculty on his part in the execution of the paper. Five disinterested witnesses, four of whom were physicians, testified that plaintiff was perfectly rational at the time he executed the release. *Held*, that the case was for the jury.

Plaintiff's claim was of right according to law, and not of grace according to equity. The dispute was as to the fact of the deed, not as to the equities under it. Whether the fact was established, was to be answered by the conscience of the jury; whether their finding was against the manifest weight of the evidence, was for the determination of the court on a motion for a new trial, and not by binding instructions on the evidence. By MR. JUSTICE DEAN.

*Release—Ratification—Evidence.*

If a person executes a release while non compos mentis and afterwards, when he has been restored to sound mind, retains and uses the consideration of the release without offering to restore it, his conduct may furnish satisfactory, and it may be even conclusive, evidence of ratification. It is not necessary that the affirmance be as solemn as the original act itself. Acquiescence, with other circumstances, may establish ratification.

A passenger injured in a railroad accident, after he had been operated upon by the railroad company's physician, executed a release, and received a money consideration therefor. He afterwards claimed that the release had been executed while he was still under the influence of anæsthetics, and that he had no consciousness of the act. He did not, however, allege any fraud upon the part of the railroad officials in procuring the release. The evidence showed that after he had been completely restored to a sound mental condition he knew that he had the money, and he also had knowledge of the main facts of the settlement. He did not offer to return the money, and he permitted the railroad company to pay his doctors' and hospital bills in accordance with the terms of the settlement. *Held*, that his conduct constituted an affirmance of the release.

Argued May 2, 1893. Reargued May 2, 1894. Appeal, No. 227, Jan. T, 1893, by defendant, from judgment of C. P. Warren Co., Sept. T., 1891, No. 19, on verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ., on reargument. Reversed.

Trespass for personal injuries. · Before NOYES, P. J.

The material facts appear by the opinion of the Supreme Court below.

Plaintiff's points were among others as follows :

" 2. The defendant in this case having admitted its liability for the injury received by the plaintiff, there are but three questions left for the determination of the jury in this case ; the first being whether or not the plaintiff knew he signed the release or satisfaction, or if he knew the character of the transaction when he did sign the same? Second, if he did not know he had signed it, or the nature or character of the transaction, then the further question arises for the consideration of the jury : Did the plaintiff afterwards, learning from the defendant or its agents that he had signed said release and been paid a consideration therefor by the defendant, ratify and confirm the same? If the jury determines both of these questions in favor of the plaintiff, then there is the further question of the amount of damages which the plaintiff sustained for the jury to determine." Affirmed. [5]

" 5. If the jury find in favor of the plaintiff they should deduct from the amount which he is entitled to recover the sum of two hundred forty dollars which he has already received from the defendant, with interest from the 24th of December, A. D. 1890 ; provided that the jury find that the plaintiff is entitled to recover more than the said sum and interest. *Answer:* Affirmed." [6]

Defendant's points were in part as follows :

" 2. There is no evidence that Mr. Hancock and Wilmoth, or either, at the time they negotiated a settlement with the plaintiff and paid him the $240, and took his release of all claim for damages, had any reason to believe, or even suspect, that plaintiff was in any way incapacitated to make a settlement and deliver a valid release of his claim for damages. *Answer :* Affirmed. There is no direct evidence, and none at

all in the case except that you may consider what flows from the testimony of the plaintiff that he was actually unconscious of what took place." [1]

" 3. The undisputed testimony being that the release was executed by the plaintiff under his hand and seal, and for the sum of $240 paid as therein acknowledged; the plaintiff, assailing the validity of the release on the ground of his unconsciousness and mental incapacity at the time of its execution, must establish such unconsciousness and incapacity by evidence so clear, precise and convincing as to satisfy the court sitting as a chancellor of such incapacity. *Answer:* This point is refused." [2]

" 4. That the release given in evidence by defendant must be regarded as a final settlement and adjustment by plaintiff of all claim for damages, unless the mental incapacity of the plaintiff to execute the same is shown by at least two witnesses, or else by one witness and such corroborative evidence as is tantamount to proof of such incapacity; and the court is requested to charge that the evidence on part of the plaintiff falls short of this requirement. *Answer:* This point is refused." [3]

" 6. That if the plaintiff was unconscious at the time he executed the release in question, but afterwards, and when restored to consciousness, knew, or had reason to believe and did believe, that the $240 was money left with him by the officials of the railroad and as compensation for his injuries, and, knowing or believing this, he made no offer to return the money, but retained and still retains it, such retention is an acquiescence in and ratification of the release. *Answer:* This point is affirmed, if you find the further fact that he knew or believed that he had executed a release, or agreed to, at least." [4]

7. Request for binding instruction. Refused. [7]

Verdict and judgment for plaintiff for $5,134.08.    Defendant appealed.

*Errors assigned* were (1–7) the above instructions, quoting them.

*William D. Brown* and *Eugene Mullin,* for the ap-

pellant.—Fraud is a serious accusation and is not lightly to be inferred: Mead v. Conroe, 113 Pa. 220; R. R. v. Shay, 82 Pa. 198.

Plaintiff in assailing such an instrument, whether on the ground of fraud, accident, mistake, or mental incapacity, however occasioned, occupies the position of a plaintiff in a bill in equity asking that defendant be enjoined from using a release in an action at law, or bill to set aside a deed obtained from plaintiff while in a state of intoxication and similar cases, and the measure of proof must be such as satisfies not only the conscience, but the intellect of the chancellor; failing which, the case should not be submitted to the jury: R. R. v. Shay, 82 Pa. 198; Dean v. Fuller, 40 Pa. 474; Graham v. Pancoast, 30 Pa. 89; Nace v. Boyer, 30 Pa. 99; Phillips v. Meily, 106 Pa. 536; English's Ap., 119 Pa. 533; Elcessor v. Elcessor, 146 Pa. 359.

The seventh assignment covers the preceding ones and more. The retention by plaintiff of the $240 paid him was admitted. There was no evidence of fraud or notice of mental unconsciousness when the release was executed, and if the plaintiff was unconscious, as claimed, it should not avail him. The executed contract of a lunatic is not void: Lancaster Co. Bank v. Moore, 78 Pa. 407. When an insane person gets the benefit of a contract without fraud of the other party and without knowledge of the insanity, the contract will not be set aside: Moore v. Hershey, 90 Pa. 196; Crawford v. Scovell, 94 Pa. 48.

In the case on review defendant may with great propriety ask this court to pass on the insufficiency of the whole testimony, for while jurors are judges of the credibility of the witnesses, they have not, without restraint, the privilege to accept the uncorroborated assertions of the interested party, and to disregard, without reason, the opposing and concurring testimony of many equally credible disinterested witnesses with equal opportunities of observation and knowledge: Mead v. Conroe, 113 Pa. 220.

*Geo. H. Higgins, O. C. & W. H. Allen* with him, for appellee.
—Undue influence is any improper or wrongful constraint, machination, or urgency, or persuasion, whereby the will of a

person is overpowered and he is induced to do or forbear an act which he would not do if left to act freely: 8 A. &. E. Ency. L. 649, 650, note I.

The case stands the same as if plaintiff, when the alleged release was submitted, had pronounced it a forgery, and set up against it that his name was forged. Surely in such a case the court would have to submit to the jury, even upon plaintiff's unsupported testimony, the question of the genuineness of plaintiff's signature: Ettinger v. Jones, 139 Pa. 218; George v. R. R., 1. A. & E. R. R. Cas. 294; Dixon v. R. R., 100 N. Y. 179.

OPINION BY. MR. JUSTICE DEAN, Oct. 1, 1894:

The plaintiff, a farmer by occupation, on December 23, 1890, while a passenger on defendant's railroad, was injured in a wreck near Bradford; his left shoulder was dislocated and broken, and his injury, if not permanent, for a long time will seriously disable him in the performance of hard manual labor. The wreck occurred about noon, and the same day the railroad company had him removed to the Riddell House, in the town of Bradford. He received some attention the same evening, and the next morning, when about to leave for his home, was visited by Mr. Wilmoth, the agent of the railroad company, and Dr. Benninghoff, the company's surgeon, who persuaded him to stay and be treated by the company's surgeons. About eleven o'clock in the forenoon of the same day, Dr. Benninghoff, accompanied by Drs. James and Stewart, two other surgeons, again visited him to make an examination of his injuries, and apply such remedy as was demanded. Anæsthetics, chloroform and ether, to the extent of bringing about insensibility to pain and unconsciousness, were administered; the examination was made, and the shoulder given such treatment as the nature of the injury called for. He was insensible from the anæsthetics for from twenty-five to thirty minutes, and in this time the surgeon's work was finished; consciousness returned, in five to ten minutes after; he then talked rationally; told the surgeons they would find some of his clothing in his satchel, then in the room, and seemed, if not entirely restored, to be rapidly regaining a normal condition. The surgeons then left. In about three quarters of an hour Dr. Stewart returned to the

room. and remained from five to ten minutes.; inquired as to his condition, and he replied he was feeling well, except some pain in his shoulder; he seemed then to have completely recovered. Between four and five o'clock in the afternoon of the same day, J. D. Hancock, Esq., solicitor, and B. J. Wilmoth, agent of the company, called upon him for the purpose of settling and obtaining a release of any claim he had for damages against the company because of his injury. They informed him of their object, and talked with him about his injury, and the basis of computation for payment. He thought he ought to have his wages while unable to work, at the rate of $1.50 per day, and possibly the cost of caring for him while getting well. He named $150 as a reasonable sum, covering his loss of earnings; Mr. Hancock thought this was not enough, considering the probable loss of time before he would recover from such an injury, and suggested the payment of $240, and he willingly accepted the offer. A release was drawn, read to him, and he affixed his signature. He expressed an intention of immediately returning home, but yielding to their persuasions and suggestion that he would have better treatment in the hospital at Bradford, he agreed to remain. The $240 was handed him in money; he requested Mr. Hancock to take his pocketbook out of his hip pocket; he did so; plaintiff then counted over the $240, took a small sum of his own out of the pocketbook, and put all together back in the pocketbook. Mr. Hancock told him that all his bills would be paid, and when about leaving the room, plaintiff said: "If it should happen I don't entirely recover the use of my limb, I will expect this company to give me a place."

The accident happened on Tuesday; the following Friday plaintiff went to the hospital in Bradford, where he remained more than three months, and about six months after the accident, on June 11, 1891, he brought this suit to recover damages for the injury, caused by the company's negligence.

On the trial, there was no denial by the company of its liability for damages. The release, however, was set up as a complete defence. To this, the plaintiff replied that, at the time it was executed, his mental condition, resulting from his injury and the effect of the anæsthetics, was such that he was wholly irresponsible; that he not only did not comprehend the nature

of the contract signed by him, but was not conscious that he was signing any paper relating to the subject of the contract.

The defendant replied that, even if this were so, afterwards, at a time when no mental incapacity is alleged, he, by distinct and unequivocal declarations and acts, ratified the contract. The court submitted all the evidence bearing on the disputed points to the jury, who found a verdict of $5,134.08 for the plaintiff. Judgment having been entered on the verdict, the defendant appeals.

The assignments of error, although seven in number, may be readily condensed to two, and still embrace all there is of substance in the errors complained of.

The court affirmed peremptorily plaintiff's first point, asking that the jury be instructed, if the release was signed by plaintiff, when, by reason of the effect of the anæsthetic, he did not know or understand the nature of the act, it was not binding upon him; and peremptorily negatived defendant's second point, which asked the court to declare that, as it was not disputed, plaintiff had accepted the $240, and signed the release, and as he now sought to invalidate the writing on the ground of mental incapacity at the time of its execution, he must establish such mental incapacity by evidence so clear, precise and convincing, as to satisfy the court, sitting as a chancellor, of the existence of the fact.

If counsel for defendant could have convinced the court of the correctness of their view of the law, there would have been no verdict against their client. For, sitting as a chancellor, the learned judge of the court below was by no means convinced of plaintiff's mental incapacity when he executed the release. The case had once been tried, with about the same verdict, which, on a motion for a new trial, was set aside by the court, in an opinion filed. In that opinion, the learned judge says : " The vital question of fact was, whether or not the plaintiff, at the time of signing the writing . . . . was or was not in possession of his mental faculties. There was evidence, by the testimony of plaintiff himself, which, if believed, clearly established his want of mental capacity at the time, and compelled us to submit the case to the jury. . . . A most careful and anxious review of the whole testimony has convinced us that the weight of the evidence was so clearly against this conclusion,

and in favor of his entire rationality at the time of the execution of the writing, that the jury must have permitted their very natural sympathy for the unfortunate plaintiff, whose case is a hard one, or their prejudices against corporations, to override their judgment."

And the second trial, apparently, produced no change in his mind, for, on the second motion for a new trial, in overruling it, he says: "In our opinion, the verdict is against the weight of the evidence. For this cause we granted a new trial after the first verdict. The question now is, whether the defendant is entitled to successive new trials, until a jury shall render a verdict in accordance with the views of the court upon the facts. . . . While we are not absolutely limited to one new trial, two verdicts the same way ought not to be disturbed without the gravest reasons for believing that the jury have acted from mistake or corrupt motives. . . . No such suggestion is made in this case, nor have we any reason to believe that a new trial would produce a different result."

So, it is manifest, if appellant could have convinced the trial judge he was sitting as a chancellor to administer equity, where there was no adequate remedy at law, he would have refused to set aside this release, because the evidence was wholly insufficient to satisfy his conscience. But the defence here rested on a contract, the existence of which depended on the assent of two minds to the same thing in the same sense. While the evidence showed the physical act, which is evidence of assent, the affixing of the signatures, the plaintiff positively denied any exercise of mental faculty on his part, in the execution of the contract. If there was no mind to impel the hand to affix the signature, there was no assent of two minds, and, in respect of this, there was no contract. Where fraud, accident or mistake in the creation of the instrument, is the defence, it is a purely equitable one, and equitable rules will be enforced as to the measure of proof to sustain it. But where the defence rests on the existence of a fact involving no element of fraud, the evidence is for the jury, under the common law rules of evidence.

Lunacy can be given in evidence under the plea of non est factum: Bensell v. Chancellor, 5 Wharton, 370. The rule of evidence is the same here as if defendant had pleaded a release,

but alleged the instrument was lost, and had then given secondary evidence of its contents ; then plaintiff had replied that no such paper had ever been executed.   The contention would have been one of pure fact, involving no equities requiring the interposition of the conscience of a chancellor, who enforces contracts, not always because of right, but of grace, and will refuse a decree destructive of the effect of a deed, on the uncorroborated testimony of a single witness.   Here there is not a spark of evidence of any misrepresentation, fraud or overreaching in the procurement of the contract ; there is, however, the positive oath of the plaintiff that, from the effects of the anæsthetic, his intellectual faculties were in a state of paralysis, so complete that he had no knowledge of the contents of the paper, or that he was signing any instrument whatever. If this were the fact, then it could not bar his recovery any more than if it had no existence ; the plaintiff's claim was of right according to law, and not of grace according to equity. The dispute was as to the fact of a deed, not as to the equities under it.   Whether the fact was established, was to be answered by the conscience of the jury ; whether their finding was against the manifest weight of the evidence, was for the determination of the court on a motion for a new trial, and not by binding instructions on the evidence.   Nevertheless, we cannot but think that the court would have performed only a plain duty, by expressing to the jury its opinion on this evidence, at the same time telling them they were not bound by it.   In two opinions of record, the learned judge, in unmistakable language, has declared the verdict was against the manifest weight of the evidence.   A careful perusal of every word of this evidence prompts us to a like conclusion ; but he had far better opportunities than we for forming an opinion ; during the course of the trial, he had the advantage of observation of the witnesses on the witness stand.   Here were five disinterested witnesses, with every means of observation, on the day the paper was executed, testifying positively to the mental capacity of the plaintiff, at the same time describing his conduct, and giving his conversation.   Four of them were men whose professional knowledge and experience must have so sharpened their perceptions, that mental incapacity was not likely to escape their notice; not a suspicion of their credibility is suggested ; yet

the uncorroborated contradictory testimony of the plaintiff, on whose oath depended a verdict, is accepted by the jury as the truth.   We say uncorroborated, because the testimony of Nolan does not contradict that of the defendant's witnesses, and, if significant at all, it tends to prove that plaintiff's conversation, after the operation, was connected and rational.   The best that can be said of the verdict, on this first question, is that the credibility of witnesses was passed on by the jury, and that they, in face of all probability, decided that the testimony of one pecuniarily interested witness was more worthy of belief than that of five pecuniarily disinterested ones, and thus the functions of the jury were preserved, while it is somewhat doubtful whether the functions of the court were.   In this there was no error which we can correct on review.   To what length the trial court shall go, in efforts to correct injustice by granting new trials, is in their discretion, not ours.

The second error preferred by defendant is raised by the answer of the court to its sixth and seventh points.   The court was requested to say to the jury : " That if the plaintiff, after being restored to consciousness, knew, or had reason to believe and did believe, that the $240 was money left with him by the officials of the railroad, and as compensation for his injuries, and, knowing or believing this, he made no offer to return the money, but retained and still retains it, such retention is an acquiescence in and ratification of the release."   And then by the seventh " That, under the whole evidence, the verdict should be for defendant."   Taking these points together, should both have received an unqualified affirmation ?

Assuming that plaintiff was not conscious of the act when he signed the release and accepted the money, what knowledge did he have of the subject afterwards, when restored to mental health, and does his conduct then amount to ratification ?   Any evidence of a clear and unequivocal character, showing an intention to affirm, will bind him.   And it is not necessary that the affirmance be as solemn as the original act itself.   Acquiescence, with other circumstances, may establish ratification : Irvine v. Irvine, 9 Wall. 627 ; Sims v. Everhardt, 102 U. S. 312 ; Frink v. Roe, 70 Cal. 311.   " If he will knowingly, and in the exercise of his proper faculties, take the benefit of a contract made while he was insane, it is competent for him to do

so.   But the consequence will be to give force and effect and
legal validity to the contract, which was before voidable : "  Al-
lis v. Billings, 6 Metc. 415.    Or as is said in 1 Gray, 434, when
he retained and enjoyed the benefits of the contract : " Had he
then full capacity to judge ?   Could he then balance the ad-
vantages and disadvantages to himself ? "    The same principle
was again announced in Gibson v. Soper, 6 Gray, 279, in the
case of a conveyance of land :  " If the grantor, having been re-
stored to sound mind, still retains and uses the consideration
of the deed, without offering to restore, or seeks to enforce the
securities, or avail himself of the contract which constitutes the
consideration, such conduct may furnish satisfactory, and it
may be conclusive, evidence of ratification."    To the same ef-
fect is Pearsoll v. Chapin, 44 Pa. 9, where the same principle
is held applicable to contracts merely voidable, and which are
the subject of affirmance or ratification without a new con-
sideration.

What was the evidence bearing on the question of ratifica-
tion ?   The last seen of the $240, before he went to the hos-
pital, was when plaintiff was yet at the Riddell House, in his
room ;   then he placed it in his pocketbook with $10 of his
own ;  this was Wednesday evening ;  on  Friday he went to
the hospital ;  the same day, the pocketbook, with the money,
was delivered to Miss M. D. Whitney, the matron, by one of
the nurses.   She then took it to plaintiff for the purpose of
giving him a receipt for it, which she  did, and he said to her,
naming the amount, it was the money he got from the railroad
company in settlement for his injury ; afterwards he told her
the railroad company had offered him work.   He said to Mrs.
Ellen Lee, about ten days after his admission to the hospital,
that he had settled with the railroad company, and they had
paid him ;   she was there visiting another patient, D. P. Smith,
an inmate of the hospital ; Smith and plaintiff also talked to-
gether  concerning  a settlement with the railroad company.
Plaintiff said he had settled with the railroad company, and
they had paid him $240, and agreed to pay his expenses
while at the hospital ; that they had talked together three or
four different times on the same subject, and plaintiff expressed
his satisfaction with the settlement.   Dr. A. M. Straight vis-
ited him in the hospital two or three weeks after his admission,

and plaintiff told him he had settled with the railroad company for $240, and they were to pay his expenses until he got able to be out; the doctor suggested a further operation on his shoulder, and plaintiff requested it to be done soon, as he was there at the expense of the railroad company. He said to Dr. Benninghoff, about two months after he had been in the hospital, that Wilmoth, the agent of the company, had promised to get him a situation. As has been noticed, in discussing the first question raised by the assignments of error, solicitor Hancock and agent Wilmoth had made him a conditional promise of a situation at the time the release was signed. On this subject, Mr. Wilmoth testifies that, about three months after the accident, he received from plaintiff, while he was still in the hospital, a letter, which is now lost, in which he asked for a position on the railroad. He made application, and secured the situation of watchman for him at Olean; then, in a few days, informed plaintiff, who said he was first going home, and then would tell him if he would accept it. The witness further stated that the company paid all the bills at the hotel and hospital.

The plaintiff says, when he counted the money on the evening of the second day at the hotel, there was $250 in the pocketbook, and he had no knowledge from whence it came; that he gave the money to the nurse at the hospital; then follows this question and answer: " Q. You said nothing to her about where you got the money? A. Not that I know of; the question was not asked me." When asked if the conversation occurred as testified to by Drs. Benninghoff and Straight, he answered: "Not that I know of." When asked if the conversation narrated by Daniel Smith had been had, he answered: "Not that I know of," but, further on, said he told him there was $240 left there, but he did not know who left it. Then is this question: "State how you thought that $240 got into your pocketbook? A. I don't understand the question." Then, on the question being repeated, he said: "I don't know how I thought it got in there. I can't remember my thoughts at that time; I didn't write them down." He further testified that he never saw Mrs. Lee, that he knew of. He admitted that at the first trial he had said "he didn't know, but supposed" the company had given it, for he had more money than he had be-

fore. He further stated, at the close of his testimony, that he had never said to anyone, he had settled with the railroad company; that what he did say, was, that the railroad company claimed they had settled with him, but that he hadn't settled with the railroad company, to his knowledge.

From the testimony of these witnesses, called by defendant, and the plaintiff's own statement in answer to it, there can be no dispute that after he entered the hospital, he knew, in some way, that a settlement had been made, and the principal terms of it. He knew he had the money, and where it came from, and that the company had agreed to pay his bills; and, while not undisputed, there is little doubt that, as part of the consideration, he expected, up until he left the hospital, to get from the company employment. Whatever may have been the condition of his mind four or five hours after the operation, when the paper was signed, there is no pretence that it was not in a normal condition all the months he was at the hospital.

The evidence, then, shows, without contradiction, that the fact of a settlement, if not binding when first executed, was, at this time, known to him; with this knowledge, he retained the money, and has it to this day; never returned it, or offered to return it; permitted the company to pay all the bills for his surgical attention, support and comfort at the hospital; and then solicited the employment that was conditionally promised him.

This is undisputed evidence of ratification of a contract by distinct and unequivocal conduct and declarations when compos mentis; and of a contract, too, which could be ratified without a new consideration, because it was only void if he chose to so treat it. It was his duty, when he first learned of the existence of the release, to disavow it, and at least, before suit was brought, return or offer to return the money received under it; for it is not pretended any fraud was practiced upon him in obtaining the release; in its worst aspect, that was executed when those acting for the company were wholly ignorant of the incapacity which is now alleged to have existed. Every day that he retained the money, and continued to accept benefits, after a knowledge of the settlement, without regard to how he gained such knowledge, was in affirmance of it. One of the very points made by his counsel at the trial, requesting

that the jury should allow defendant a credit for the $240, and render a verdict for the balance, was wholly inconsistent with their claim that no such contract existed.

Where there is a disaffirmance of the contract because of fraud, the injured party may, in some cases, bring his action without repaying, or offering to repay, the money received on the fraudulent contract. In such case, the money is retained, not as part of the consideration of a contract he denies, but as part indemnity for the fraud perpetrated on him. As he was deceived into accepting it by a falsehood or fraud, there is no admission that it was a consideration for a contract, and there is, consequently, no obligation on him to return it. But the case is wholly different, when he seeks to. avoid a contract, solely because of a temporary incapacity when he made it; an incapacity of which he gave no sign, and which was unknown to the other party to the contract. His conduct in keeping the money, in accepting payment of all his bills at the hospital, after restoration to complete mental health, with the undoubted knowledge as to where the money came from, and as to who paid his bills and why, is only consistent with an intention to affirm the contract. It is conclusive evidence of affirmance.

He cannot both affirm and disaffirm; cannot affirm for what he got, and disaffirm for the difference between that and what he hoped to get.

The defendant was entitled to an unqualified affirmation of its sixth and seventh points; therefore the judgment is reversed at costs' of appellee.

DISSENTING OPINION BY MR. CHIEF JUSTICE STERRETT:

While a passenger on defendant's road, the plaintiff was very seriously and permanently injured in consequence of defendant's negligence, and without any fault of his own. His shoulder was broken and dislocated, and other injuries were suffered by him, from the shock of which he was rendered unconscious for several hours. He received no surgical or medical attention until the next morning when the company's surgeons called on him and, at about eleven o'clock in the forenoon, in a small bedroom without any outside windows for ventilation, administered an anæsthetic, and, as far as possible, reduced the fracture. For forty minutes of the time the operation was in

progress plaintiff was completely anæsthetized. Between four and five o'clock of same day, a special agent of the defendant, in company with its solictor, called and gave plaintiff $240, on behalf of the company, and took from him a release of any claim or demand he had against the company for damages. That release was interposed as a bar to plaintiff's recovery in this action. In response to that, plaintiff alleged and testified that he was not aware he had executed the release, and was not conscious of anything that transpired from the time the anæsthetic was administered until he awakened in the evening. In this, he was strongly corroborated by several facts and circumstances referred to in the testimony. On the trial, the defendant virtually admitted its original liability to plaintiff for the injuries he had suffered. Its sole defence was that his claim had been settled by compromise, and that the $240, paid by defendant, was received by him in full satisfaction.

The controlling question presented by the record, for the consideration of this court, is embraced in defendant's second specification of error, complaining of the court's refusal to affirm its third point, viz: " The undisputed testimony being that the release was executed by the plaintiff under his hand and seal, and for the sum of $240, as therein acknowledged, the plaintiff assailing the validity of the release on the ground of his unconsciousness and mental incapacity at the time of its execution, must establish such unconsciousness and incapacity by evidence so clear and conclusive as to satisfy the court, sitting as a chancellor, of such incapacity."

The principle is well settled that parol evidence to amend, alter or rescind a written instrument under seal, on the ground of fraud, must be clear, precise and indubitable, otherwise it should be withdrawn from the jury. But the case at bar is not of that character, and it would be an utter perversion of the sound and salutary principle, referred to, to apply it to the undisputed facts of this case. No attempt was made by the plaintiff to amend, alter or rescind the release in question. He alleged in substance that there was no release ; that, if he signed the paper at all, he did so while he was under the influence of an anæsthetic, and was non compos mentis. His own testimony, with strong corroborating facts and circumstances, was to that effect.

The execution of a written instrument, to be legally binding upon the person executing it, requires more than his mere signature. It is necessary that both mind and will shall co-operate in the execution and delivery of the instrument. The testimony on behalf of plaintiff, direct as well as circumstantial, tends strongly to prove that there was no such co-operation in this case. If there was not, then, in contemplation of law, there was no execution and delivery of the alleged release. A substantial question of fact was thus presented which it was the exclusive province of the jury to determine in the ordinary way. The case is much the same as if the plaintiff had alleged the release was a forgery and had introduced testimony tending to prove that fact. Surely in such case the court would be bound to submit to the jury, even on plaintiff's unsupported testimony, the question of the genuineness of his signature. If authority for so plain a proposition be required, there is an abundance of it to be found. In Dixon v. Brooklyn City, etc. Ry. Co., 100 N. Y. 170, the defendant set up a release, executed by plaintiff, of all claim for damages. There was testimony tending to show that at the time the release was executed, plaintiff was in a condition of mind that rendered him incompetent to appreciate the character of the instrument which he signed. The court held that it was for the jury to determine whether it was his free act, done with full knowledge, at the time, of the facts, and with a full appreciation of what he was doing. To the same effect are George v. Railroad Co., 1 Am. & Eng. R. R. Cases, 297, and Railroad v. Lewis, 109 Ill. 120. The same principle is also recognized by Mr. Chief Justice PAXSON in Ettinger v. Jones, 139.Pa. 218, 223. Referring to the release that was set up as a bar in that case, he says: "It is to be further observed that there was no attempt to reform or contradict the release. The paper was admitted, but the allegation was that it had been procured by fraud, which is quite another matter." So in this case, there was no attempt to reform or contradict the release. The plaintiff merely sought to show, by his own and other testimony, that such was the condition of his mind at the time that he was wholly incompetent to execute the release,—that he was unconscious of what he was doing at the time.

The learned judge was clearly right in qualifying his answer

to defendant's sixth point, recited in the fourth specification of error.    If the release was obtained at a time when plaintiff was incapacitated to contract, it was void ab initio, as between the parties, and could not stand in the way of plaintiff's right to recover.    An absolutely void instrument cannot affect the successful assertion of a legal right which it purports to release.    The release never had any binding force, and hence there could not be anything to rescind.    A contract, void on account of fraud or for any other reason, is, in law, as though it had never been executed; and plaintiff, in the circumstances, was not bound to return the money to defendant before bringing suit.    At most, it was entitled, if at all, to nothing more than a credit, on account of plaintiff's demand, for the amount paid to and expended for him.

A careful examination of all the testimony has convinced me that there was an abundance of competent testimony, which the court was bound to submit to the jury, to justify them in finding as they did, and that their verdict cannot be set aside without doing violence to the well settled principle that as a general rule the determination of questions of fact is exclusively for the jury.    Upon them, in this case, rested the responsibility of determining whether, at the time the release was procured, the plaintiff was incapacitated to execute the same and thus settle his claim for damages ; and upon them that responsibility should be permitted to rest.

It is also contended that there was evidence of subsequent ratification of the release by the plaintiff, such as his retaining the money that was given him by defendant's agents, etc., and that, upon that evidence, the learned judge should have held, as matter of law, that, having thus ratified the release, he could not recover.    Conceding, for the sake of argument, that there was some testimony bearing on the question of ratification, the court surely would have had no right to invade the province of the jury and undertake to determine whether plaintiff did or did not ratify the release.    If the testimony was sufficient to raise that question, it was clearly one of fact for the exclusive determination of the jury, and not one of law for the court.

In view of the evidence as to the serious nature of plaintiff's injuries, the verdict was not excessive.    The case was twice

submitted to and passed upon by a jury. The verdict of the first jury was $5,000; that of the second, upon which this judgment was entered, was $134.08 more. If the facts and circumstances of the more than questionable transaction, in which the pittance of $240 was thrust upon the then unconscious plaintiff, as full compensation for the serious and permanent injuries he received, are withheld from the consideration of the constitutional triers of fact, and the so-called release pronounced valid and binding, the defendant, in my opinion, will be the unjust gainer and the plaintiff the unfortunate loser of nearly $5,000. I am unable to discover any error in the judgment or in the proceedings leading up thereto, and would therefore affirm it.