BURNS v. ESTATE OF READING.

1. COMPROMISE AND SETTLEMENT—RELEASE—RATIFICATION—FRAUD.
   In proceedings against a decedent's estate to secure 'compensation for personal injuries, defendant estate claimed that the injured employee had accepted $250 in full settlement and satisfaction, and had executed a release under seal for his broken leg. The limb, failing to knit, claimant attempted to repudiate the settlement and recover for his injury, which resulted in amputation, charging the physicians with fraudulently misrepresenting to claimant his true condition. He made no complaint of the alleged fraud during upwards of twenty months after the date of the release. Claimant was advised of the falsity of this alleged medical advice within a few days after his executing the release, when his leg was amputated. Another writing was executed by claimant within a few weeks of the injury, and just before the operation, referring to the compromise and expressly confirming it. Claimant was over 40 years old. He could read and write and was intelligent. *Held*, that he had ratified the release by long acquiescence and could not repudiate it for fraud after so long a period.

2. SAME—RATIFICATION—DELAY.
   One who seeks to rescind a compromise for fraud must act promptly after discovering the wrong and must return the consideration received in full.

Error to Wayne; Codd, J.   Submitted June 8, 1915. (Docket No. 16.)   Decided December 21, 1915.

Fred Burns presented his claim against the estate of Harvey J. Reading, deceased, for personal injuries. From the disallowance of the claim in probate court claimant appealed to the circuit court.   Judgment for defendant upon a directed verdict.   Claimant brings error.   Affirmed.

*William Jerome Kuertz* and *Dohany & Dohany*, for appellant.

*Dohany & Hersch* and *Allan H. Frazer*, for appellee.

STEERE, J. This case originated in the probate court of Wayne county where appellant, Burns, filed a claim against the estate of Harvey J. Reading for personal injuries sustained on June 1, 1910, while in the employ of Reading, who then was engaged in the trucking business in the city of Detroit and had a warehouse in which goods were at times stored. On the day of the accident a truck driver named Wilson and appellant, Burns, were sent late in the afternoon to haul some old office partitions from Reading's office on Woodbridge street to his warehouse. When they arrived at the warehouse with the load the freight elevator operator at that building had gone home for the day, but Reading was yet there, and under his instructions the partitions were loaded upon the elevator, of which Reading took charge, and started it with the three men on board for the fifth floor of the building, where it was intended to store the material. Just before they reached the fifth floor the elevator cable broke and the loaded cage with the three men in it fell to the ground floor. Burns and Wilson were seriously injured. The record contains no direct statement as to Reading, though it seems inferable that he was then killed or died soon after, as no mention is made of him alive subsequent to the accident, and only his administrator and other representatives of his estate figure in subsequent events. Burns and Wilson were at once taken to Red Cross Hospital, where they received proper care and medical attention. The bones of Burns' left leg were bruised and broken in two places between the knee and ankle. He remained in the hospital until the 6th of January, 1911, over seven months, during which time, after the physicians found the

bones of his leg would not knit, and two operations had been performed in an attempt to save the limb, it was finally amputated, on November 11, 1910.

The claim was disallowed in probate court, and an appeal taken by claimant to the circuit court, where upon the trial a verdict was directed for defendant. For appellant it is charged that the accident was occasioned by negligence of Reading in not properly managing the elevator; and particularly in failing to seasonably check it before certain projecting portions of the partitions loaded upon it under his supervision came in contact with the roof of the elevator shaft, causing a sudden and heavy strain upon the cable and breaking it. It is also claimed that the cable was worn, crystallized, and weak, so as not to be sufficiently strong to withstand the extra strain which he put upon it by the negligent manner in which he operated the elevator.

In the circuit court defendant filed a plea of the general issue, with notice of settlement of said claim for $250 and payment of the same to claimant in full on July 26, 1910, by Reading's administrator, which claim was allowed against the estate by the then commissioners on claims, and never appealed, and became absolute long before application for revival of the commission on claims was made and the matter again presented, whereby the same became *res adjudicata,* and that amputation of Burns' limb was made necessary because of a diseased condition of his system continuing from previous to the time of his injury and of which he had full knowledge prior to the amputation, to which he consented, at the same time reaffirming the settlement previously made. The court directed a verdict in favor of defendant at the conclusion of appellant's testimony, on the ground that it conclusively appeared he had settled his claim for all damages against the

Reading estate on the 26th day of July, 1910, and was then paid in full according to the terms of said settlement, which he again confirmed in writing and ratified on the 7th day of November, 1910, and, with full knowledge of all the facts, circumstances, and conditions, he had made no complaint, acquiesced in the settlement, and slept upon his rights, if any, taking no steps to rescind for such a period of time that he was barred by delay and laches from prosecuting his claim.

No evidence having been introduced by the defense, only claimant's testimony presenting his side of the case is before the court. As a verdict was directed against him, his evidence is to be considered in its most favorable aspect, and the question is, when so considered: Does it establish *prima facie* a cause of action?

It is shown that a Mr. Hawkins, who had been book-keeper for Reading, and was appointed administrator of his estate, looked after the two injured men, each of whom had a fractured limb. They were taken to the hospital, where they remained and were cared for with proper nursing and medical attention at defendant's expense so long as their necessities required and until discharged as recovered. Hawkins visited them from time to time, looking after their wants, and showing them various kindly attentions. At about the same time, and before they were discharged, he agreed upon a settlement with each and paid him the agreed amount. Wilson had suffered a broken leg at the ankle, and remained in the hospital two months, as testified by Burns, though other testimony shows a shorter time. For the first two months a Dr. Corville, house physician or surgeon of the hospital, was in charge of Burns' case and his regular attending physician. He was at times assisted by Dr. Schwanz, who after two months assumed full charge. On July 26, 1910, while Dr. Corville was yet in charge, Hawkins and Burns agreed

upon a settlement of any claim the latter might have against Reading's estate for the sum of $250, which was then paid. Fifty dollars of this Burns sent home, and the balance he had put in the hospital safe for him. At the time of this settlement he signed the following paper:

"DETROIT, MICHIGAN, July 26, 1910.

"Know all men by these presents that I, Fred Burns, of Detroit, Michigan, having been injured by the falling of a freight elevator in the warehouse of Harvey J. Reading, now deceased, at the corner of. Sixth and Congress streets, in the city of Detroit, on June 1, 1910, and having received, since that time, medical treatment at the Red Cross hospital in Detroit at the expense of said Reading and his estate, and having made a claim for damages against the estate of said Harvey J. Reading, which claim has been denied by Charles W. Hawkins, administrator of said estate, in consequence whereof a difference has arisen between myself and the said administrator respecting the same, and having, for the purpose of terminating said difference, agreed with the said administrator that I will accept the sum of two hundred and fifty ($250) dollars in full satisfaction and settlement of my claim above stated:

"Now, I do hereby acknowledge that I have this day received from said Charles W. Hawkins, administrator, the sum of two hundred and fifty ($250) dollars, which I hereby accept in full settlement of all claims of whatsoever nature that I have had or may have against the estate of said Harvey J. Reading, deceased, by reason of the injuries received by me as aforesaid, or from any other cause, and in consideration of said medical treatment and said money I do hereby release and discharge the said estate and the said administrator thereof from any and all claim, demand and liability whatsoever.

[Signed]     "FRED BURNS."

The broken bones of Burns' leg refused to knit, and, all attempts to save the limb proving unsuccessful, after a couple of operations and an X-ray examination,

it was finally decided by the physician (he then having been in the hospital over five months) that the leg could not be saved, and an amputation was performed, as already stated, on November 11th. Before the amputation Dr. Schwanz, then in charge, discussed the matter fully with Burns, telling him the situation, and that the leg could not be saved, and, after Dr. Corville had also expressed the same view, Burns consented to the operation. Before the operation Dr. Schwanz told him that Hawkins & Harris, defendant's attorneys, had a paper for him to sign, and proposed that they "talk it over *pro* and *con*," suggesting that Burns sign it. The paper was handed to him to read, and he subsequently signed and swore to it. The paper is as follows:

"On this 7th day of November, nineteen hundred and ten, I, Fred Burns, make the following statement of facts:

"*First.* That on June 1, 1910, I received a compound fracture of my left leg, between the knee and ankle joints, in an elevator accident in the warehouse of Harvey J. Reading, now deceased.

"*Second.* That at the direction of said Harvey J. Reading, I was sent to the Red Cross Hospital for medical treatment.

"*Third.* That I have since received medical treatment from said institution, with its physicians in charge, and my limb was treated in the usual manner of fractured limbs expecting that within a reasonable time said limb would be repaired, all the expense of which treatment has been paid or assumed by the administrator of said Reading.

"*Fourth.* That during my treatment at said hospital I made a settlement with the administrator of said Reading estate, and released said estate from all liability to me, which settlement I now confirm.

"*Fifth.* That on or about July 25th the physician in charge, Dr. Charles W. Corville, notified me that the bones were not uniting in the usual manner, and that it would be necessary to perform an operation on the said limb and wire the bones together.

"*Sixth.* That after due consultation with physicians in charge, Drs. Chas. W. Corville and M. J. Schwanz, I consented to the operation, that the said bones in my limb be wired together, with the expectation that said operation would result in repairment to said limb, and said operation was performed about August 1, 1910.

"*Seventh.* That on October 1st Drs. M. J. Schwanz and D. H. Newton, after due examination, decided the joints had not united, and in all probability would not unite, on account of the condition of the bone.

"*Eighth.* That said physicians recommended to me that, in order to save my life whole, I consent to an amputation of the fractured limb:

"Now, therefore, in view of all the facts as herein stated, and after due consideration of them in my own mind, I hereby, of my own free will and consent, exonerating all others connected herewith, agree to allow the said physicians to amputate my left leg at or below the knee joint, and that said amputation is made in the interest of preserving my health and life.

"In witness thereof I have hereto set my hand and seal the day and year first above written.

[Signed]    "FRED BURNS.

"Witness:
[Signed]    "M. J. SCHWANZ."

A jurat attached to this shows that it was sworn to by Burns before William C. Harris, as notary, on November 8, 1910.

These instruments, if voluntarily and understandingly signed, are manifestly binding upon claimant and conclusive. The fact that Hawkins, or defendant's attorney, or any one else solicited or advised him to make the settlement and sign the papers is no ground for repudiating them, unless they induced him to do so by some fraud or misrepresentation. He was then a man over 40 years of age, with a common school education, given to reading, and apparently intelligent. He spent much time reading while in the hospital. He could and did read the release signed by him on July 26th, and testified that he understood every word of

it at the time he signed it, but claims he was deceived as to the condition of his leg and the prospect of recovery by Hawkins and Dr. Newton, a physician who was employed by defendant. He does not, however, give any testimony which imputes fraud or deception to the hospital physicians who were in charge of his case. Although he testified that Dr. Corville, who first took charge of the case, told him in reply to his inquiry that it would take the broken limb eight weeks to heal, he also testified that later, when he asked the physician if his leg was healing, he would not answer him.

The circumstances of the alleged misrepresentation and settlement, as told by Burns, are, briefly, as follows: In a talk between him and Hawkins the latter said:

" 'Better have two doctors' word than one to find out how the leg was getting along.' He said that I would feel more encouraged to have the word of two than one. He said he would bring the doctor of the Reading estate, Dr. Newton."

That following this talk, and three or four days before the settlement, Hawkins brought Dr. Newton to the hospital. That Dr. Newton made an examination of the leg in the presence of Dr. Corville, and said it "was getting along all right, * * * doing fine; 'massage your leg, and you will be out of here in two weeks,' " which encouraging information he believed. That Hawkins, who was present when Dr. Newton made the examination, came in the next day and they talked of a settlement. Of this he testifies in part:

"That is the first time he or any person representing the Reading Company talked to me about a settlement. He said then that he would like to settle with me because he would like to get me off the books, and he did not like to carry me on, but I would be protected. * * * Mr. Hawkins said he had Dr. Newton's report of the condition of my leg, and it was doing well, and he wanted to settle, and he said that he would

like to get me off the books, and I would be protected. And I accepted it. He offered me $250. * * * At the time I signed this release I relied upon the statements of Dr. Newton and Hawkins."

It is not shown that the physicians in charge of his case ratified what Dr. Newton said or gave him any reason to think his leg was healing. His own testimony tends to the contrary. He knew Dr. Newton was defendant's medical representative and that Hawkins based his representations on Newton's report. But, conceding that his claim of reliance upon the representations of defendant's physician at the time of settlement raised an issue of fraudulent inducement, he had full knowledge that such representations were untrue long before and at the time he signed and swore to the second paper of November 7th, shortly before his leg was amputated. His testimony as to this second paper, signed without protest over three months after the settlement, and when he knew the full measure of the deception he claims was practiced upon him, is equivocal and peculiar. He at first denied signing such a paper, but, on its being shown to him, admitted that he did sign and swear to it, and testified to circumstances, including the manner of administering the oath to him. Requested to read the paper over carefully and point out anything wrong in it, he did so, pointing out certain matters in the fifth, sixth, and seventh paragraphs as follows: That Dr. Corville did not notify him the bones were not uniting in the usual manner, and that witness did not consent to an operation after consultation with "physicians in charge, Drs. Corville and Schwanz," but the operation was performed after Dr. Schwanz said it must be done; that the statement in paragraph 7 was incorrect so far as he had knowledge, because Schwanz and Newton were never in consultation in his presence. Having completed his examination of the paper, he was asked:

"*Q.* Is it all right except as you have pointed out?"

And he answered:

"Except as I have pointed out, everything is all right.
"*Q.* The rest is true?
"*A.* Yes.   *   *   *
"*Q.* You confirm the statement in all its particulars, with the exception of those corrections you have made?
"*A.* Yes.   *   *   *
"*Q.* After you have read it over carefully again?
"*A.* Yes."

The following day he modified this by testifying that his attorney had pointed out to him the words "I confirm," which he did not know the meaning of till it was explained to him, and in answer to further inquiry again said he understood all the other words in the paper with the exception of "confirm," and the balance was absolutely true, except the discrepancies he had previously pointed out. He also testified in relation to the execution of this paper that at the time he signed it he was weak and sick, had been suffering pain, at times had been given hypodermics to enable him to sleep, and the idea of having his leg amputated frightened him so that he was not in condition to act and think normally; that the matter was first presented to him by Dr. Schwanz, who said that, as his leg was to be amputated, Mr. Hawkins and Mr. Harris had a paper it was desired he should sign, and the doctor proposed that they "talk it over *pro* and *con*," suggesting that he sign it, and it was handed him to read, and he signed it. The paper particularly makes mention of the previous settlement, as to which he then knew, as well as he ever knew later, whether or not he had been induced by fraud and false representations to enter into and sign the previous release, and he knew the second paper came from the same parties as the first. He offers no proof of any promises, false representations, or inducements by any one as to the

second paper. It is difficult to reconcile his claim that his signature to the first was obtained by fraud and deceit with his signing the second after full knowledge of the fraud claimed to have been perpetrated upon him on the former occasion, even though, as he states, he did not understand the word "confirm," and eliminating the portions which he pointed out as incorrect.

Claimant's evidence shows that early in August, but a few days after this settlement was made and the agreed sum had been paid to him, while the transaction was yet fresh in his memory, the falsity of what he states Dr. Newton told him, and upon which he says he relied, was strikingly made plain to him by the operation in which his leg was opened and the bones wired because they had not knit, and again brought home to him when, as he testified, Dr. Schwanz, on the day after the wires were removed, told him his leg had to come off. With knowledge of these facts he not only signed the second paper, but remained in the hospital for near two months without raising any question or making any protest in relation to the settlement. He testifies that Wilson visited him, and Hawkins, with whom he continued on friendly terms, called upon him occasionally and went with him to the train when he started for his home in Ohio, but he never made any complaint to him nor talked about the settlement.

The first knowledge defendant or its representatives had that claimant questioned the settlement was when, in April, 1912, nearly two years later, he filed a petition in probate court of Wayne county to revive the commission on claims followed by a tender back of the money, with interest, paid at the time of the settlement on July 26, 1910. He did not tender or offer to pay the cost of his medical attendance and hospital expenses which had been paid or assumed by defendant for him.

It appears by claimant's testimony that on July 26, 1910, he settled with defendant's representative an unliquidated and disputed claim with a clear understanding of the terms of settlement, and was paid in full the agreed amount, signing a receipt and release of his claim. The contract was executed. His contention now is that it was voidable as to him and he has a right to repudiate and rescind it because he was induced to make the contract by the intentionally false and fraudulent professional opinion or statement of the doctor of the adverse party as to the condition of his leg and prospect of recovery, upon which, as stated to him by the doctor and urged by Hawkins, he relied. Taking his testimony as true, and conceding this might have raised an issue for the jury if timely urged, we are confronted with the elementary rule of law applicable to such cases that a party who desires to rescind a contract on the ground of fraud must be guilty of no unreasonable delay, and upon discovery of the fraud act promptly, make or tender restitution, announce his purpose and adhere to it; otherwise he will be held to have waived the objection and ratified the contract. In the recent case of Bertha v. Motor Car Co., 180 Mich. 51 (146 N. W. 389), cited by appellant, and held to be a case for the jury, the court emphasizes by repetition the fact that immediately on discovering that defendant's physician had misrepresented the extent of his injury plaintiff repudiated the settlement and tendered back, with interest, what had been paid him.

While no duty exists to repudiate the contract and return the consideration until the fraud is discovered, and in such case intervening time will not affect the complaining party's rights, this court has said:

"The decisions on fraud all hold in this State that a party defrauded is bound to use active diligence, and to use no unavoidable delay in complaining." Lewless v. Railroad Co., 65 Mich. 292 (32 N. W. 790).

We are not dealing with a chancery suit to rescind a contract on the ground of fraud, which comes within the cognizance of a court of equity and opens the door for the application of other principles, but an action at law based upon the theory that the party aggrieved has already rescinded it, as he had the right and legal power to do without the aid of a court, and, in the absence of proof of prompt rescission with return, or offer to return, whatever of value was received in consideration of the settlement, the contract stands as a legal bar to prosecution of the original cause of action.

In *Gibson* v. *Railroad Co.*, 164 Pa. 142 (30 Atl. 308, 44 Am. St. Rep. 586), plaintiff was injured in a railroad accident, and settled with defendant shortly after he had been under the influence of anæsthetics, as a result of which he claimed to have not been in full possession of his mental faculties. About six months later he repudiated the settlement and brought suit. It developed that he was more seriously injured than at first supposed, and he was confined in the hospital at defendant's expense for more than three months. Of this the court said in part:

"Whatever may have been the condition of his mind four or five hours after the operation, when the paper was signed, there is no pretense that it was not in a normal condition all the months he was at the hospital. * * * Every day that he retained the money and continued to accept benefits, after a knowledge of the settlement, without regard to how he gained such knowledge, was in affirmance of it. * * * His conduct in keeping the money, in accepting payment of all his bills at the hospital, after restoration to complete mental health, with the undoubted knowledge as to where the money came from, and as to who paid his bills and why, is only consistent with an intention to affirm the contract. It is conclusive evidence of affirmance."

In justification of the delay it is urged that no release could arise from failure to promptly disaffirm

until claimant was informed both of the falsity of the representations upon which he relied in making the settlement and of his right to disaffirm on that ground, citing *Alabama, etc., R. Co.* v. *Jones,* 73 Miss. 110 (19 South. 105). We are not prepared to indorse the conclusions reached in that case as applied to an action at law of this nature. There is no proof nor presumption that claimant at any time believed himself without redress because he had been fraudulently induced to sign a release which he would not otherwise have signed. He was a man of mature years, not ignorant nor illiterate. He stated that he commenced to speak about it with an acquaintance, asking him if he knew of a good attorney, and was referred to the counsel he engaged. He at first stated he consulted counsel in the summer of 1912, but later corrected himself, and fixed the time as the latter part of the summer of 1911. He took no steps, however, to rescind or refund, to the knowledge of defendant or its representatives, until April, 1912. For over 18 months after full knowledge of that of which he now complains he remained silent and treated the matter as a full and final settlement. During that time he ratified the releases he had signed, both by his silence and failure to return that of value which he had received under the contract and by accepting further benefits, without intimation of dissatisfaction, after full cognizance of the facts which he now urges as a ground of rescission. His long acquiescence and failure to complain promptly, as was his duty on discovery of the true conditions operated, as a matter of law, under the undisputed facts, to reaffirm the contract of settlement which has now become a bar to the prosecution of his stated original cause of action.

The judgment is affirmed.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice MCALVAY, who sat in this case, took no part in this decision.