## Whittington v. H. T. Cottam Co.

(In Banc. Nov. 17, 1930.)

[130 So. 746. No. 28563.]

Barbour & Henry, of Yazoo City, and McNeil & Arrington, of Crystal Springs, for appellant.

Chalmers Potter and Green & Green, of Jackson, for appellee.

**Anderson, J.,** delivered the opinion of the court.

Appellant brought this action against the appellee in the circuit court of Hinds county to recover damages for a personal injury suffered by appellant resulting from a collision between a Ford automobile, in which appellant was traveling, and a motor truck being used by the appellee in the transportation of goods, alleged to have been caused by the negligence of the driver of appellee's truck.

At the conclusion of the evidence for the appellant, the court, on motion of the appellee, directed a verdict and

judgment in favor of the latter, from which judgment the appellant prosecutes this appeal.

The appellee pleaded the general issue and gave notice thereunder that it would show, by the evidence, an accord and satisfaction between the parties of whatever damages appellant had suffered because of the alleged negligence of the appellee. Appellant replied to the notice that the release relied on by appellee as an accord and satisfaction was procured by fraud, and was, therefore, void and not binding on appellant. The court sustained the appellee's motion to exclude the evidence, and directed a verdict in favor of the appellee upon the ground that the evidence established, without conflict, an accord and satisfaction. The appellant's contention is that, under the evidence, it was a question for the jury whether an accord and satisfaction had been established, and that, therefore, the court erred in directing a verdict in the appellee's favor.

Stating the case made by the evidence most favorably to the appellant, the following facts were established: The injury occurred on November 16, 1927. The evidence showed that the appellant was injured through the negligence of the driver of the appellee's truck and the negligent manner in which the truck was lighted, and that his injuries were serious and permanent. The release, which the court held to be an accord and satisfaction, was executed on November 19th, three days after the injury. At the time the release was executed, there were present, beside the appellant, E. L. Stidham, the agent of the Travelers' Insurance Company, appellee's indemnitor; George Whittington; W. B. Montgomery, former county surveyor of Hinds county; W. K. Robinette, deputy sheriff of Hinds county; and J. H. Whittington, an uncle of appellant. Montgomery, Robinette, J. H. Whittington and E. L. Stidham witnessed the execution of the release by the appellant and signed same as such witnesses. The certificate to the release signed by them, among other

things, recited that they were present at the signing of the release and that the appellant, of his own free will and accord, released the appellee of all responsibility for the injury suffered by the appellant, and that the appellant appeared to be sound mentally, and to understand the nature and import of the release.

The appellant did not offer Montgomery, Robinette, or Stidham as witnesses to establish that the release was procured by fraud. The appellant, as a witness in his own behalf, testified that he had no recollection of signing the release; that when he did sign it he did not know what he was doing; that at the time of the execution of the release he was suffering intense physical and mental pain and was under the influence of opiates and was incapable of executing the release. Other evidence on behalf of the appellant tended to corroborate his testimony in that respect. The appellant testified that he was first conscious on Sunday, the afternoon of November 20th, the next day after the execution of the release.

The consideration to be paid appellant for the release was the sum of five hundred dollars which was not paid at the time of its execution, but was to be, and was, paid later. On November 21, 1927, two days after the release had been executed, J. F. Hogan, agent of the Travelers' Insurance Company, wrote appellant this letter: "Attached you will find our draft No. E—518614 payable to your order, for the sum of five hundred dollars. This is in accordance with the settlement which you effected with Mr. Stidham of this office." This letter and check could not have been received earlier than the next day, November 22d. The evidence showed that before the appellant received the letter and check his father knew that the release had been executed. At the request of the appellant, his father, about November 29, 1927, deposited the check in a bank to the credit of appellant. The father testified that the check was lying on a table in the room occupied by the appellant at the hospital, and when he

was leaving the appellant said: "Papa, there is a paper —he says 'take it and tend to it.'" Accordingly the father took the check, and, as stated, deposited it in a bank to the appellant's credit. This was done with appellant's knowledge and consent. Appellant was treated for his injuries by Dr. Gordon, knowing that under the terms of the release Dr. Gordon was being paid for his services by the appellee. After the appellant knew the extent of his injuries he continued to go to Dr. Gordon for treatment with full knowledge of all the facts. This continued until the latter part of December, 1928. The appellant spent all the five hundred dollars received under the release as compensation for his injuries. In March, 1929, a barber told the appellant that, if the release was signed at a time when the appellant did not know what he was doing, it was void and would not bind him. The appellant thereupon saw Mr. Arrington, one of his counsel in this case, who made an investigation of the facts and brought this action in August, 1929, about twenty-one months after the execution of the release.

The appellant argues that the judgment should be reversed under the principles laid down in Jones v. Ry. Co., 72 Miss. 22, 16 So. 379; Ry. Co. v. Jones, 73 Miss. 110, 19 So. 105, 106, 55 Am. St. Rep. 488; Kansas City R. R. Co. v. Chiles, 86 Miss. 361, 38 So. 498; St. L. & San F. R. R. Co. v. Ault, 101 Miss. 341, 58 So. 102; Davis v. Elzey, 126 Miss. 789, 88 So. 630, 89 So. 666, and Dana v. R. R. Co., 106 Miss. 497, 64 So. 214.

The Jones case was twice before the supreme court, first as reported in 72 Miss. and again in 73 Miss. The plaintiff in that case was an ignorant negro. In less than twelve hours after the amputation of his foot which had been crushed by a railroad train, he was visited in his home by a railroad official, and while stupid from opiates, and ignorant of what was transpiring, awakening only when aroused, and while suffering mentally and bodily, and in the absence of any frineds competent to advise

him, was induced to sign a release of all damages in consideration of the payment to him by the railroad company of five hundred dollars. The court held that the release was fraudulent and void. The plaintiff knew nothing of the settlement for about two weeks, and, when told of it, stated that, if he had been in his right mind, he would not have made it, and as soon as possible he consulted trusted white friends who, with plaintiff's wife, shortly afterwards, secured counsel. Plaintiff remained in bed for about two months after signing the release and spent all the money paid him by the railroad company, but several months afterward tendered the amount back to the company. The court held that it was a question for the jury whether the plaintiff had ratified the release. On the second appeal of the case from a judgment against the railroad company, the court held that the plaintiff was not bound by the release, "unless, after being fully informed of all the facts, and of his rights in the premises, he concluded to treat it as a final settlement, notwithstanding such imposition upon him."

In the Chiles case, the court held that good faith on the part of a wrongdoer, by whose negligence a personal injury is caused, and a full understanding on the part of the person injured as to his rights, are indispensable to the validity of a release of a claim for the injury, and that the evidence as to all the surrounding conditions and the attitude of the contracting parties is admissible on the issue as to the validity of the release. In the Ault case the court held that, where a release from damages for a personal injury is obtained by fraud, it is void, and the plaintiff on bringing suit need not tender the money received thereunder, but the jury, on rendering verdict for the plaintiff, should give the defendant credit for the money paid for such release and legal interest thereon. In the Elzey case the court held that, where a person is injured in a collision with a railroad train and a release is relied on by the railroad company as a defense to the action,

and the evidence is in conflict as to the capacity of such person to make the settlement, it is a question for the jury whether such release is binding. In the Dana case, the court held that, where an employee of a railroad company sued the company for damages for a personal injury, and the railroad company defended on the ground that there had been an accord and satisfaction of the plaintiff's claim, to which the latter replied that the accord was fraudulently obtained, it was error for the court to sustain a demurrer to such replication.

We do not think any of those cases is directly in point and decisive of the question here involved. Here we have a delay of about twenty-one months before suit was brought. The evidence showed, without conflict, that during at least a period of twenty months after the execution of the release, and before suit, the appellant had full knowledge of all the facts and circumstances connected with the release and full knowledge of the extent of his injuries, and, in addition, that he deliberately spent for his own purposes the consideration of five hundred dollars paid him for the release. During that time the appellant took no steps whatever to rescind the settlement except to consult counsel in reference thereto about fifteen months after the execution of the release.

If a party defrauded desires to disaffirm a contract procured by fraud, he must do so with reasonable dispatch after discovery of the fraud. He must make his election, and this election must be made unreservedly. Knowing the facts, he cannot deal with the subject-matter of the contract and afterwards rescind it. The election is with him. He may affirm or disaffirm the contract, but he cannot do both. If he has full opportunity to learn all the facts and the law applicable thereto, and fails, within a reasonable time, to rescind the contract, he is bound by it. He must exercise that degree of diligence which may be fairly expected from a reasonable person. Alabama & V. R. R. Co. v. Kropp, 129 Miss. 616, 92 So. 691, 693;

858

Grymes v. Sanders, 93 U. S. 55, 61, 23 L. Ed. 798; Harrison v. Ry. Co., 144 Ala. 246, 40 So. 394, 6 Ann. Cas. 804; R. R. Co. v. Pierce (C. C. A.), 64 F. 293; Gibson v. R. R. Co., 164 Pa. 142, 30 A. 308, 44 Am. St. Rep. 586; Aaron v. Mendel, 78 Ky. 427, 39 Am. Rep. 248; Ry. Co. v. Giardino, 116 Tenn. 368, 92 S. W. 855, 8 Ann. Cas. 176.

In the Kropp case the plaintiff suffered an injury at the hands of the railroad company, and shortly thereafter, in consideration of the settlement of his claim for the injury, accepted the sum of one hundred twenty-five dollars from the railroad company. The settlement was embodied in a written release executed by the plaintiff. The injury suffered by the plaintiff was severe and resulted in the amputation of one of his legs. The release was pleaded by the railroad company as a defense to the action. The plaintiff replied that the release was procured by a false and fraudulent promise by the railroad company to give him employment which had been refused him. The court in its opinion, among other things, said, that: "He had full opportunity to learn all the facts and to learn the law with reference thereto. . . . Again, we think that, if these views were not sound, it would have been the duty of the complainant to have learned the facts or make reasonable efforts to do so and to have sought rescission of the contract because of the fraud within a reasonable time after he was refused employment. . . . If his version of the settlement be true, it would have been natural for him to have sought to place himself upon the pay roll as quickly as possible and to have found out the reason why, and, if the contract was not lived up to, to have elected to rescind and sue for his damages. . . . Having waited more than five years after he was entitled to be re-employed, and during all of that time retaining the funds received by the settlement, this warrants the court in holding that he had ratified the contract as written, and that it is too late now to seek rescission."

There is another element of ratification in this case that should be considered. When the appellant accepted the five hundred dollars, the consideration for the release, according to his own testimony, he was in his right mind. He knew exactly what he was doing. If the parties to a contract contemplate that the present performance of the contract shall be a discharge of the original claim, the mere contract, standing alone, does not constitute an accord and satisfaction—the performance of the contract is necessary to complete it. Whitney v. Cook, 53 Miss. 551; Yazoo & M. V. R. R. Co. v. Fulton, 71 Miss. 385, 14 So. 271; Foster v. City of Meridian, 150 Miss. 715, 116 So. 820. It is clear from the facts and circumstances surrounding the execution of the release by the appellant that the parties did not contemplate that the release alone should constitute an accord and satisfaction, but that the performance by the appellant of the contract—the actual payment of the five hundred dollars—was necessary to complete the contract. In other words, until the five hundred dollars was actually paid, there had been only an accord, not an accord and satisfaction.

When the appellant regained his mind and found the letter and check for five hundred on the table in his room, he admits that he knew exactly what it meant. He should have known that the transaction would not be completed until he had accepted the five hundred dollars. Under the law, he was due, if not then and there, certainly within a reasonable time, to notify the appellee that he would refuse to accept the five hundred dollars in satisfaction of the accord. His failure to do so in connection with the other facts above set out in this opinion, about which there was no conflict in the evidence, we think, amounted to an irrevocable ratification of the settlement and was binding on the appellant.

The ground upon which the two dissenting opinions in this case are based was not presented or passed upon in the circuit court, nor was it argued or briefed by coun-

sel for either of the parties in this court. The general rule is that a question not raised on appeal will not be considered by the court. 3 C. J., page 1431, section 1594. We think it should be a very unusual case to authorize the supreme court to violate that rule. We have no such case here. On the contrary, every question argued and briefed is settled by decisions of this court. If this court will decide correctly the questions presented and briefed in cases, it will be doing well, without going out on a hunt for other questions.

The dissenting judges would have the court to hold that a contract with a person, while such person is suffering from a serious injury or sickness, which contract has to do directly with that injury or sickness, shall be presumed prima facie to be void, as against public policy; but that such presumption may be rebutted by evidence of the fairness of the contract, and that the injured or sick person entered into the contract knowing his condition, and the nature and quality of the act he was doing. No authority is cited in either of the dissenting opinions to sustain such a proposition of law, and we have been unable to find any. Contracts in violation of public policy are not voidable, but absolutely void, and the courts will refuse aid to either of the parties. Harris v. McKissack, 34 Miss. 464; Hoover v. Pierce, 26 Miss. 627; Deans v. McLendon, 30 Miss. 343; Am. Mfg. Co. v. Crescent Drug Co., 113 Miss. 130, 73 So. 883; L. R. A. 1917D, 482, note; Mitchell v. Campbell, 111 Miss. 806, 72 So. 231; Dixie Rubber Co. v. Catoe, 145 Miss. 342, 110 So. 670.

The dissenting judges would have the court to hold, further, that such a contract, being prima-facie void as against public policy, could not be ratified by the injured person, notwithstanding conduct tending to show ratification might have a very strong probative value on the question whether the contract was fairly entered into.

Affirmed.

**Ethridge, J.,** delivered a dissenting opinion.

Under the facts in this case I am of the opinion that the settlement relied upon by the appellee was void, being contrary to public policy and incapable of ratification. It clearly appears that the appellant did not know the nature and extent of his injuries, and that it would have been dangerous for him to have known the situation as it existed prior to or during the time of the settlement. It is certainly the public policy of the state that, where a person or corporation inflicts personal injuries upon another party through negligence, such party shall compensate the injured person to the full extent of his injuries, unless the negligence of the injured party contributed to the injury, and, where it does, that the party inflicting the injury shall compensate the party injured at least to the extent the negligence of the party injuring the other bears to the negligence of the party injured.

It also seems to me to be a sound proposition that it is contrary to public policy for a person to seek a settlement under the circumstances disclosed in this record prior to the time the injured party has become fully acquainted with the extent of his injuries and their probable consequence and time to be informed of his legal rights in reference thereto, and that whenever a settlement is made in a hospital or sick room, when the person injured is not fully restored, it should be treated as prima-facie void, and it should devolve upon the party procuring such settlement to show affirmatively that the person injured was in full possession of his faculties, knew the nature and extent of his injuries, and was capable of settling the matter intelligently with the knowledge of the facts. It is well known that a person ill or seriously injured should be kept quiet and all matters of business, and especially with reference to the sickness or injuries, should be kept off his mind. Often a full disclosure of the nature and extent and probable consequence of the injury would

seriously militate against the successful treatment and recovery of the injured or sick person. It is well known that it is a constant practice, even among the best and most truthful people, to deceive the sick or injured person to keep him or her in a hopeful mood. Candor and frankness in such cases would often be followed by the most serious consequences to the health or even the life of the sick or injured person. It is a different question from the question of fraud in my opinion. The party making the settlement or procuring the settlement from the injured person may act from honest motives and with honest purposes and himself be ignorant of the true facts as to the physical or mental condition of the injured or sick person; he may have concealed nothing from the sick or injured person and may not have misrepresented anything, and still the parties may be on the grossest kind of inequality with reference to the situation. It is certainly unfair for one party having full possession of all his faculties and knowing or able to know and find out without serious consequence to himself the real facts and the other who is not in a position to know or appreciate his own situation and the probable consequence that will result from it. To permit gross unjust and inadequate settlements such as the one involved in this case to be upheld will in many cases result in the injured person being placed upon the public for care and support, and the public is consequently vitally affected by such unjust and inadequate settlements made under such circumstances.

The court cannot be blind to modern developments and practices. It should take cognizance of the customs, practices, and growth of conditions and circumstances that spring up into the everyday life of the people. We know that under modern conditions most employers and other large business concerns subject to be sued for accidents and injuries inflicted upon employees and other people seek protection in liability insurance, and that liability

insurance companies assume responsibility, for a given consideration, to pay such claims as may be lawfully established and to conduct and defend litigation in reference thereto. It is well known that they employ agents and persons to seek settlements of these injuries shortly after they are inflicted or incurred, and also that they employ physicians and hospital aid to render first aid to persons damaged by those to whom they issue liability policies. It may be that there are practices on the part of others, similar to these outlined, seeking to obtain employment to bring suits on behalf of the injured person against the person or corporation inflicting the injury, and these persons often act with undue haste in many cases in trying to procure contracts of employment. In my opinion all such practices are harmful to the best interest of all concerned, and it would be greatly promotive of the public welfare, and consequently promotive of public policy of the state, to hold that any contract made under conditions above mentioned are prima-facie void, devolving upon the person procuring the contract the burden of proving that the injured person or sick party was fully cognizant of the facts and had knowledge of his condition and the probable consequence thereof, and, if the proof shows that at the time of the settlement the party was not cognizant of the nature and extent of his injuries or not in full possession of his mental faculties, to hold that such contract was absolutely void and incapable of ratification. If, on the other hand, the party procuring the settlement establishes by competent proof that the party was cognizant of the nature and extent of his injuries and advised of the probable consequence of them and in possession of his mental faculties, to uphold such settlement; but it seems to me that settlements or contracts made with undue haste before the nature and extent of the injuries can be ascertained or disclosed properly to the injured person should find no sanctuary in the courts of this enlightened age.

**Griffith, J.**, delivered a dissenting opinion.

It is sufficiently stated in the majority opinion that on the record before us the facts show liability against the defendant, but as to the injury nothing is said except that it was serious and permanent. The statement therefore requires amplification both as to the nature of the injury and the circumstances of the alleged release.

Under the undisputed testimony a heavy commercial truck of defendant traveling at a rapid rate at night, and with only one light and on the wrong side of the highway, ran into the automobile in which appellant was riding as a guest, with the result that the skull of appellant was crushed in on the left front side thereof, and with such force and effect as not only to pulverize the skull bone, but also to penetrate the dura and enter the brain. This was on the night of November 16th. Within a few hours appellant was received at the hospital and there an operation was immediately performed. The skull bone, outer and inner, was removed leaving a hole two inches in diameter, or a little more, covered only by the skin, and which today leaves the wound in such condition that the pulsation of the heart can be seen through this hole, and, when the victim leans forward or stoops, the brain falls down and protrudes through the hole, being held back only by the outer skin, and such minor processes as nature has been able to send in aid. It is not necessary to pursue the further details; these may be summarized by the statement that it has been said by one of the world's greatest surgeons that in many respects it would be better that the victim be dead than try to live on with such an injury.

What happened after the operation from a surgical or medical standpoint is not disclosed, except from the hospital records which show that the wound and the head were heavily bandaged, that drains into the wound had been inserted, and that the patient was to be given opiates

as needed. Appellant testifies that he remembers nothing that happened from the moment of the collision until the following Sunday afternoon, November 20th; and the testimony discloses, without dispute, that appellant did not know that a part of his skull had been removed, and that there was a permanent hole in his head covering about half the left side of his forehead until the day before he was released from the hospital in December, when the bandages were removed and the nurse exhibited the wound by means of a mirror and then told the appellant what had actually happened.

In the meantime, however, and on Saturday following the injury on Thursday night, an adjuster for a liability insurance company, the carrier of the liability insurance for appellee, had been permitted to get into this hospital and into the presence of the victim of this injury, and there to secure what is euphoniously termed a release, which paper reads as follows:

"Jackson, Mississippi, November 19, 1927.

"$500.00

"Received from H. T. Cottam & Company the sum of five hundred and No/100 dollars plus the bills of Dr. A. E. Gordon and the Baptist Hospital not to exceed a total sum of six hundred and No/100 dollars combined which I (being of lawful age) acknowledge to be in full accord and final satisfaction of a disputed claim growing out of an injury sustained by me on or about November 16, 1927, for which bodily injury and its results I have claimed the said H. T. Cottam & Company to be legally liable, which legal liability is expressly denied, and

"In consideration of said sum so paid, I hereby remise, release, and forever discharge the said H. T. Cottam & Company heirs, successors, administrators, and assigns from any and all actions, causes of actions, claims and demands, for, upon, or by reason of, any damage, loss, injury or death or suffering which heretofore has been, or which hereafter may be, sustained by me, my estate, or

any other person in consequence of such accident and injury, and

"I do consent that any doctor, physician, or surgeon, may testify in any controversy with reference thereto. ·

"Witness my hand and seal this the day and date first above written. ·

"(Signed)  G. H. WHITTINGTON.

"Witnessed: W. B. Montgomery; W. K. Robinette; J. H. Whittington; E. L. Stidham."·

At this point, in addition to the facts already stated, it is necessary to add only that appellant testifies that he remembers nothing of said release, knew nothing that happened that day, and did not know anything until the Sunday following, and there is the testimony of appellant's uncle, who was present, that he protested against the execution of any papers on the ground that appellant was in no condition to know what he was doing. This testimony must be taken as true, for the judgment here was on a peremptory instruction for defendant. On Tuesday, November 22d, the check for the five hundred dollars came and was delivered to appellant's father, who deposited it in bank. After appellant's release from the hospital and from the injury above mentioned, it was again necessary for appellant to have an operation, but what this was for does not clearly appear from the record. It would seem, however, that it was for some injury to the side, although the only thing found in the original hospital record of a further injury is the entry: "Patient also had laceration of hip, sutured." Some part of the money paid for the alleged release was used on this latter operation, but how much does not distinctly appear. After appellant was finally able to go about, which was in January, he soon discovered that he would not be able to do any work of any gainful consequence, and he has not since been able, and in addition he suffers constantly from pains in the head and from peculiar tingling sensations in his arms. He has no education, having reached

only the fourth grade in school; he lives with his father who is unable to read and write, and who is a small tenant farmer. Appellant admits that he realized his condition in a few months after his final release from these hospital operations, and admits that in driblets as time went on he spent for necessities, some of it for medicines, the money paid him for said release. But he says that being ignorant of such matters, and supposing that his signature to a release bound him without recourse, he took no steps not knowing that he could, until more than twelve months thereafter when he was advised by a friend, who happened to interrogate him in respect to the injury, and who then further advised him to consult a reputable attorney, which was then immediately done and thereafter suit was brought.

The majority opinion does not undertake a defense of the alleged release in this case, or of the manner of its procurement; nor, in the light of conscience and the numerous denunciations of such transactions by this court in the past, is it hardly to be seen how the machinations of said alleged release could be defended. The majority place their opinion squarely upon the ground of a ratification, and this, although the amount paid this appellant was so pitifully, not to say contemptuously, inadequate that this court would instantly have set the verdict aside if such an amount had been returned by a jury in the case of such an injury as this.

Upon the question of ratification, we say that such a contract of release, under the facts of this case, is utterly void; is against public policy, and because of its corruption should be placed beyond the sanctuary of ratification. We refer to the opinion of such transactions as expressed by this court in the past, as, for instance, in Jones v. Railway Co., 72 Miss. at page 27, 16 So. 379, 380, where the court said: "Is anything more than its naked statement needed to shock the conscience? There is a fitter place for the execution of such a release than the sick

room of a sufferer, and a fitter time than a period follow-
ing, by less than twelve hours, the amputation of his foot.
Unhesitatingly we join the Illinois supreme court in pro-
nouncing this 'indecent haste' . . . and declaring
that this release, if thus obtained, is an absolute nullity.
Courts do not sit to sanction such travesties of contract.''
And let us for a moment turn to similar language of this
court, for instance, in Railroad Co. v. Chiles, 86 Miss. at
pages 365, 366, 38 So. 498, and in Railroad Co. v. Ault,
101 Miss. at pages 349-351, 58 So. 102.

Those were the expressions of the court in the days
when there were few such injuries, and when there were
but few public or private hospitals, and in consequence,
but few of the body of the people were affected by these
happenings. But now another age has arrived, and with
additional lines of railway covering the entire state,
motorbus transportation companies on all the principle
highways, and the automobile everywhere, to say nothing
of additional industries, the pages of the public prints
are filled with the reports of accidents and injuries, and
hospitals now grown numerous throughout the state are
crowded with the victims of the new order of our social
and commercial life. The law must advance to meet these
conditions, and must extend its lines of fortification to
correspond with the needs of the advancement of the
times—if the law is to continue to serve the purposes upon
which its institution is founded, namely the enforcement
of justice amongst men, which, to state the same propo-
sition in the reverse, is to prevent injustice amongst men.

We say that now such a pretended contract of release
as is before us should, not only be declared void as against
conscience as our courts have so often heretofore de-
clared. but that it should at this day be further said of
them that they are void as against public policy, arising
out of the times and the new order that has arisen in
our advancing material civilization. The public policy of
a state has reference to the interests of the people thereof

in the several following respects: The public health, the public morals, the public safety, the public welfare, the administration of public justice, and the like, and it progresses in step with the ever changing conditions of commerce, the mechanical arts, and all those newly arising elements and operative influences which affect the lives, the safety, and the rights of the people. The term "public policy" "embraces all acts or contracts which tend clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security for individual rights which any citizen ought to feel." 6 R. C. L., p. 712. "In substance it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellowmen, having due regard to all the circumstances of each particular relation and situation. Sometimes such public policy is declared by constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man." Pittsburgh, C., C. & St. L. R. Co. v. Kinney, 95 Ohio St. 64, 115 N. E. 505, L. R. A. 1917D, 641, Ann. Cas. 1918B, at page 288. And the court adds in effect that, whenever a course of conduct is positively hurtful or shockingly unconscionable in "the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be constitution, statute or decree of court." Or as said by our own court in Spinks v. Davis, 32 Miss. at page 156: "It is a sufficient objection to a contract, on the ground of public policy, that it has a direct tendency to induce

fraud and malpractice upon the rights of others, or the violation or neglect of high public duties.''

In the light of the foregoing principles what would be thought of a contract by the superintendent of a hospital or the surgeons there in charge, made with the carrier of liability insurance that, at once upon the admission to the hospital of the victim of a serious injury—as for instance when his skull is mashed in—inflicted by any person or corporation insured by said contractor, the said superintendent or surgeons would immediately notify the liability insurance adjuster and secure admission to the presence of the sufferer, regardless of the latter's condition, and would aid in procuring a release? The inviolable duty of said superintendent and of said surgeons—and this duty is the same whether in a hospital, an apartment, or a home—is to the health of the patient, and to do everything and use every available means to restore the sufferer, so far as within human power, to his former physical soundness, and this, too, as speedily as safely may be. It is a matter of universal acceptance among the medical profession and of universal common knowledge among laymen that seriously injured patients must be kept in a cheerful and confident mood, and the extent of the injury should be kept from their knowledge so far as possible; otherwise despondency and hopelessness and grief at a permanent injury will militate against a recovery and often result in death which would not have occurred had the patient not known the real truth. Often such sufferers are strangers, often they are poor and friendless and still more often they must depend on their daily manual labor for subsistence. Disclosures in such cases of the reality of the injury would work the most detrimental results, and at best in such cases the mind of the patient is far from that condition which will enable him to deal in justice to himself in relation to business matters of any kind. But in view of what has just been said, how could he deal in reference to his injuries? He

must know the nature, the extent, and the probable consequences thereof in order to make a contract just to himself in reference to them, and yet, if the surgeon or physician should tell him the full extent and probable consequences, it would often and all chances of a recovery and escape from death, and a physician who would so inform him fully in such a case would be only fit to be scourged from his high profession.

So what, therefore, of the sort of contract just above suggested? Would there be any hesitancy in declaring it void as against public policy? To advance the matter a step nearer, suppose a liability insurance carrier should make a contract with an expert adjuster by which that adjuster would keep in touch with all hospitals within, say, thirty miles, and would arrange with these hospitals to gain entrance for the purpose of obtaining a release at once upon any serious injury by any person or corporation carried by the liability insurer, and all this regardless of the condition of the victim at the time—is it possible that there is any court anywhere that would not declare such a contract void, and void as against public policy? And now suppose an adjuster without any contract so to do yet does that very thing, is there any less the same reasons and solid grounds present for saying that what he has done is void and in contravention of the sanctions of public policy? None; and that is the case we have before us, according to this record.

There is another feature of this case that challenges attention. It will be observed that at the botom of the above-quoted release there is a provision waiving the privilege of the statute as to the testimony of the physician. The reasons and the abuses that brought about the passage of that statute in this state are too well known to require mention here. It is our duty to enforce that statute and uphold the policy upon which it rests, and which it, in part, expresses. All that is necessary to do in order to throw that statute into the waste basket is to

get a release with the quoted provision in it; and it makes no difference that the patient was filled with opiates or raving in delirium, if only a cross-mark can be obtained —the privileged testimony is let in, and for all purposes. As against such a procedure, it is the duty of courts to draw the lines of the law more tightly. When evasions of the law and its policy confront the court, its duty is to strangle such evasions and put them out of the way.

I therefore fully concur in the dissenting opinion of Judge ETHRIDGE, and hold with him that any contract, with any person while yet suffering from a serious injury or sickness, which contract has to do directly with that injury or sickness, shall be presumed, prima facie, to be void as against public policy, and that the burden shall devolve upon the person relying upon such a contract to show its entire fairness, that it was made when the opposite party knew or had had the full opportunity to know his condition and when no reason appertaining to correct medical treatment existed or remained for not fully informing the injured or diseased person of the nature and extent of the injury or sickness. In the language of the court in the Jones case: "There is a fitter place for the execution of such a release than the sick room of a sufferer, and a fitter time than a period following, by less than twelve hours, the amputation of his foot." This would eliminate at the same time and with equal applicability the ambulance chaser and the procurer of wrongful releases; would do the sufferer the justice to give him time and opportunity for recovery and for his later action when he is convalescent in mind as well as in body, and at a time when the contract, if made, can be defended and upheld upon its own intrinsic fairness and validity, and when for that reason the matter of ratification will disappear as an essential inquiry. If fair and legitimate, the contract will stand alone and without the need of aid; whereas, if wrongful and illegitimate by reason of being in contravention of the considerations

hereinabove mentioned, it ought not be allowed aid in a court of justice, in such a case as we have here before us, or in any similar case.

We notice the concluding portion of the majority opinion wherein it is mentioned that the point upon which we rely has not been expressly raised in the arguments. The rule of practice mentioned is undoubtedly a salutary one, but at last it is only a rule of practice, not of positive law; and in applying it we should be sure that the particular case does not require us to find a better one in that greatest of all Codes where, when a somewhat similar plea was made, the answer was, ''The voice of thy brother's blood crieth unto me from the ground.''