HINES, et al. *v.* HAMBRICK.

In Banc. Jan. 2, 1951.

No. 37729 (49 So. (2d) 690)

C. S. Carlton, R. H. Henderson, and McDonald, Mc-Donald & Kuhn, for appellant.

**J. W. Kellum**, for appellee.

Roberds, P. J.

On January 1, 1949, Mrs. Hines, by written agreement, leased to Hambrick a plantation in Tallahatchie County, Mississippi. She reserved the right to sell the property and terminate the lease and gave Hambrick the refusal to purchase it at such price as she might be offered and which she was willing to accept.

On September 9, 1949, Mrs. Hines entered into a contract with Waldrup under which she agreed to sell and he agreed to purchase the plantation on stated terms, subject to the prior purchase right of Hambrick.

On the same day, Mrs. Hines gave Hambrick notice of the price but not the terms, which she had been offered. Negotiations were then had between Mrs. Hines and Hambrick, as hereinafter set out.

On September 24, 1949, Mrs. Hines and Hambrick entered into a written agreement terminating the lease and adjusting and settling certain disputes pertaining thereto, as a part of which Hambrick waived and released all right to purchase the plantation.

Hambrick filed the bill herein to set aside, on the ground of fraud, his settlement contract and the Waldrup purchase contract. He offered to purchase the property upon the terms set out in the Hines-Waldrup contract upon conveyance to him of title to the plantation. The chancellor sustained the prayer of the bill and Mrs. Hines and Waldrup appeal.

The appeal involves these questions:

First, did the provision in the lease giving Hambrick the preference to purchase at the "price" at which Mrs. Hines was willing to sell include the right in Hambrick to purchase on the terms Mrs. Hambrick was willing to accept?

Second, was there an obligation on Mrs. Hines to disclose to Hambrick the terms? If so, was that obligation dependent upon a demand of such terms by Hambrick,

and, if so, does the proof herein disclose he made such demand?

Third, was the settlement agreement binding upon Hambrick?'

We have concluded the settlement agreement was and is binding upon Hambrick, and, therefore, do not discuss the first two propositions except as such discussion may bear upon the third question.

We consider now the settlement agreement. Hambrick says it was procured through fraud of Mrs. Hines. That fraud, he says, consisted in the failure of Mrs. Hines to disclose to him the terms of the Waldrup offer to purchase the plantation.

The lease was for a period of five years, beginning January 1, 1949, with right in Mrs. Hines, the lessor, to sell the plantation and terminate the lease, and with the right in Hambrick, the lessee, ". . . to purchase prior to any sale to any other party, and such rights shall be at the same price at which the Lessor may receive a bona fide offer." The Waldrup offer was for $109,000, of which $10,000 was to be paid in cash, and the balance in annual payments over a period of ten years. On the day of the Waldrup contract, attorneys for Mrs. Hines wrote Hambrick that Mrs. Hines had received an offer at the named price without disclosing the terms of payment, asking Hambrick to give notice whether he desired to exercise his option. Hambrick asked Carlton, one of counsel for Mrs. Hines, whether this meant all cash and Carlton said he so understood but would find out from Mrs. Hines, who resided in Memphis, what terms, if any, she would make him. He did contact Mrs. Hines and obtained terms. He informed Hambrick of the terms. In the meantime Hambrick had engaged Breland & Whitten as his attorneys. Hambrick testified they had full authority to represent him and to negotiate for terms with Mrs. Hines. These attorneys had a number of conferences with Carlton & Henderson, counsel for Mrs. Hines. Finally, Carlton informed

attorneys for Hambrick that Mrs. Hines would accept $32,500 cash, the balance payable in stated annual installments over a period of five years. Included within the described land was what was termed the "separate" or "lost" forty. Apparently Mr. Hambrick did not desire to purchase that forty acres. He and his attorneys were informed this tract might be omitted from his purchase. Breland informed Hambrick of the terms, and Breland testified that "Mr. Hambrick told me, he said he thought that would be all right; he had to go and see some other people, as I recall, he was intending to take somebody else in the transaction with him. And some days later he came back and told me the party didn't want to go into it, and that he had decided he didn't want to buy it himself, and it was then after that that this release was drawn in the office . . . .". Breland also testified "Mr. Hambrick had told me he had made up his mind that he didn't want to purchase it on those terms and at that price." No one claims that Mrs. Hines was requested to disclose to Hambrick, or his attorneys, the terms of the Waldrup proposal. The nearest thing to such a request was this statement of Breland: "Then I went to Mr. Carlton I think, and Mr. Carlton, as I recall, said that he had the proposal by Waldrup in his office, but he wasn't privileged to show it to me without his client's consent, and I agreed with him that I didn't think he ought." No one, not even Breland, intimated in the testimony that Mrs. Hines was requested to disclose the Waldrup terms, or that her attorneys were asked to procure her consent for them to do so. The testimony is positive no one made such request of Mrs. Hines. On the other hand, Mr. Whitten testified that they, as attorneys for Hambrick, intentionally and deliberately refrained from asking for the Waldrup terms. They did not want to know them. They feared Hambrick could not meet them and thereby would waive his right to purchase. They preferred to negotiate with Mrs. Hines for terms to Hambrick, which they did. It might

be added that Hambrick testified on the stand that he could and would have purchased on the Waldrup terms had he known them. Breland suggested that all questions arising under the lease, as well as the option of Hambrick to purchase, should be settled by agreement between the parties. The parties themselves and their attorneys met in the office of Carlton & Henderson in Sumner, Mississippi, and, after a full discussion, entered into the following agreement, prepared jointly by all the attorneys:

"State of Mississippi

"County of Tallahatchie

"This agreement made and entered into and executed in duplicate originals on this the 24th day of September, 1949, by and between Mrs. Charlotte Hines, hereinafter called the Party of the First Part, and J. H. Hambrick, hereinafter called the Party of the Second Part, Witnesseth:

"(1) For and in consideration of the mutual agreements, undertakings, and releases herein contained, the receipt and sufficiency of which is hereby acknowledged, the parties hereto covenant and agree as set out hereinafter.

"(2) The party of the second part releases all rights to purchase that certain property described in the contract referred to hereinafter and specifically releases all right of all kinds under paragraph 7 of said contract, that contract being of date January 1, 1949, between the parties hereto and of record in Deed Book 89 at pages 361-65 of the records in the office of the Chancery Clerk of Tallahatchie County, Mississippi, in the Second District, at Sumner.

"(3) All rights under said lease and contract recorded at said Book 89 at pages 361-65 are hereby released and terminated as of December 31, 1949.

"(4) In a final accounting between the parties hereto, the party of the second part shall pay to the party of the first part a cash rental of Eight and No/100 Dollars

($8.00) per acre on Three Hundred Twenty Five (325) acres, being a total of Two Thousand Six Hundred Dollars ($2,600.00), and the party of the first part agrees to accept said sum in full settlement of all cash rental due under the aforesaid lease contract.

"(5) On a final accounting between the parties hereto all sums expended by the party of the second part for labor and material in the construction and repair of buildings on the leased property shall be credited against the indebtedness owing by the party of the second part to party of the first part.

"(6) The party of the second part shall not be held accountable on final settlement with the party of the first part for any sums of money drawn by him for tenants' and representing tenants' shares in cotton seed, and any such amounts which have been debited as an indebtedness owing by the party of the second part to the party of the first part shall now be credited to such account.

"(7) All terms of said lease contract of record in Deed Book 89 as aforesaid shall remain in full force and effect until December 31, 1949, except as otherwise provided herein.

"(8) In event the accounts of the parties hereto are not mutually agreeable, after adjustment as herein provided, all differences shall be arbitrated pursuant to Title III, Chapter 1, of the Mississippi Code of 1942.

"Witness our hands, the day and date first hereinabove written.

"/s/ Mrs. Charlotte Hines
Mrs. Charlotte Hines
"/s/ J. H. Hambrick
J. H. Hambrick"

The instrument was then and there duly acknowledged by both parties. Is this agreement, executed by Hambrick under these circumstances, binding upon him? We think so for two principal reasons.

First, we do not see that any fraud was practiced upon Hambrick under the lease contract. As stated, Mrs. Hines contends that the prior right of Hambrick in that lease to purchase the property at the same price as might be offered by another imposed no obligation to permit Hambrick to purchase upon the same terms as another. Whether right or wrong, which we do not decide, the contention is certainly legitimate and reasonable. But if the word "price" does include terms, Hambrick certainly should have requested Mrs. Hines to give him the terms. Mrs. Hines did not refuse to give them; she simply kept silent about them, and, as stated, it is uncontradicted that Hambrick did not want to know the terms. He had able counsel and they thought that was the best strategy for Hambrick. The benefits Hambrick obtained under the settlement agreement indicate that was the best strategy.

In the second place, there is no showing whatever in this record that Hambrick was deceived or misled into executing the settlement agreement. The only intimation of fraud is that he did not then know the Waldrup terms. Well, he knew he did not know them. No one represented or misrepresented them. He simply preferred to adjust all of his differences regardless of the Waldrup terms. And, in addition, had he requested the terms and Mrs. Hines had refused, and in that situation had he executed the settlement agreement, he would have waived whatever wrong Mrs. Hines had committed. At most, that would have been a violation of contract on the part of Mrs. Hines. ██ █ There being no fraud inducing him to enter into the settlement agreement, he, by that act, waived all prior wrong of which he had knowledge when he made the settlement. ██ █ "Where the person defrauded after having knowledge of the fraud enters into a new contract concerning the same subject matter, or an agreement modifying the original contract, or renews the original contract for an additional term, or asks favors, as, for example, requesting an ex-

tension of time for performance, he will ordinarily be regarded as having waived the fraud in the original transaction . . .''. 37 C. J. S., Fraud, Section 69, p. 364, and authorities cited in footnotes. See the following Mississippi cases supporting the same principle: Pintard v. Martin, Smedes & M. Ch. 126; Edwards v. Roberts, 7 Smedes & M. 544; Georgia Pac. Ry. Company v. Brooks, 66 Miss. 583, 6 So. 467; Whittington v. H. T. Cottam Company, 158 Miss. 847, 130 So. 745, 76 A. L. R. 332; Blue Ribbon Creamery v. Monk, 168 Miss. 130, 147 So. 329, 782.

Had Hambrick desired to maintain his contention that Mrs. Hines was under obligation to inform him of, the terms of the Waldrup offer, he should have insisted upon that being done, and, if necessary, then instituted legal proceedings to enforce his right, rather than enter into another contract regarding the same subject matter, expressly waiving his right.

Now, this settlement contract was a valuable agreement for Hambrick. This plantation contained 872 acres in all. The lease agreement stipulated that for purpose of rent payment the acreage would be 828 acres. The rent was to be one-fourth of the cotton and one-fourth of the cotton seed produced upon land planted to cotton, and cash rental of eight dollars per acre for the remaining acreage up to 828 acres. When this settlement was made, Mrs. Hines was insisting that Hambrick was obligated to pay cash rent upon 425 acres. Hambrick was contending that he was to pay cash rent upon 325 acres. In other words, there was a rent dispute between them of $800. It will be noted that in paragraph (4) of the settlement agreement, Mrs. Hines contracted away her contention and Hambrick got the benefit of that $800. In paragraph (6) Hambrick was given credit for all sums he had drawn for accounts of tenants and the shares of tenants in cotton seed. These amounts had been charged to Hambrick. Presumably, they had been drawn from Mrs. Hines, because she and Hambrick, on

the date of the lease agreement, had entered into a contract under which Mrs. Hines was to advance Hambrick as much as $10,000 with which to produce his crop. This paragraph recites the amounts had been charged as an indebtedness against Hambrick. The total of such charges is not shown in the evidence. However, the settlement agreement shows that, whereas Hambrick had been charged with them, yet as a part of this settlement he was credited with them. The settlement agreement also provides for arbitration, under the law, of any further differences which might arise between the parties. All in all, it is clear this settlement agreement was very valuable to Hambrick.

It will be further noted that in paragraph (4) of the settlement Hambrick was to pay $2,600 cash rent. The Waldrup contract was filed for record October 24, 1949. On November 29 thereafter, Hambrick paid to Mrs. Hines the $2,600 cash rent. Also, on the date of the Waldrup purchase contract he had put up $7,500 earnest money in case Hambrick did not purchase the property and the sale to him was consummated. The total cash payment by Waldrup was to be $10,000. After the execution of the Hambrick settlement agreement, and with knowledge of such settlement, Waldrup, before the institution of this suit, paid Mrs. Hines $2,500 more, which, added to the $7,500 he had already deposited in escrow, aggregated the total cash payment of $10,000. It is argued by appellant that the recording of the Waldrup contract was constructive notice to Hambrick and that his payment thereafter of $2,600 under the settlement agreement was a ratification of that agreement and is a bar to any right he may have had to set it aside. Also, it is urged that the payment by Waldrup of the $2,500 and payment outright to Mrs. Hines on the purchase price of the $7,500 theretofore held in escrow, having knowledge of and relying upon the settlement agreement would preclude Hambrick from attacking the Waldrup contract and the settlement agreement. However, we deem it

unnecessary to pass upon these contentions since, as shown above, we think Hambrick's bill should have been dismissed on other grounds. We set this out to give a clear picture of the situation between the parties.

We emphasize, as █ the decisive point in this case, that no one misled or deceived or induced Hambrick to make the settlement agreement. If it be said he was wronged by not being informed of the Waldrup terms, the complete answer is that he made the settlement contract knowing the Waldrup trade included terms, and that he did not know them, had not asked Mrs. Hines for them, and his attorneys said they did not want to know them. He had knowledge of the wrong, if there was wrong. He had a right to waive it. He did waive it by his deliberate and free agreement adjusting and settling all matters between himself and Mrs. Hines, supported by valuable considerations, which he and his attorneys determined was to his benefit, and which later was fully performed by both parties.

Reversed and decree here dismissing the bill.

**Hall, J.** (dissenting).

Feeling that the appellants have deliberately and designedly perpetrated a colossal fraud upon appellee, as found by the chancellor, I respectfully dissent from the conclusion reached by a majority of the Court.

Appellee's option to purchase is as follows: "It is agreed and understood that if, during the life of this contract, the Lessor desires to sell the aforesaid property, the Lessee shall have the right to purchase prior to any sale to any other party, and such rights shall be at the same price at which the Lessor may receive a *bona fide* offer, any attempt to sell to any other party without an offer to the Lessee as herein provided shall be null and void and of no effect. The Lessee shall, within fifteen days after the giving of written notice of the desire of the Lessor to sell said property, advise the

Lessor in writing whether or not he desires to accept said property and to exercise his right to purchase.''

This clause provided that appellee would be entitled to purchase this property ''at the same price at which the Lessor (appellant Mrs. Hines) may receive a bona fide offer.'' Nothing was said about terms. The majority opinion brushes aside without discussion whether the word ''price'' included by necessary implication that appellee should also have the same terms as some other person might offer. In my opinion, ''the same price'' necessarily carries an implication that the appellee should have the same terms as some other prospective purchaser. In Jurgensen v. Morris, 194 App. Div. 92, 185 N. Y. S. 386, 387, the Supreme Court of New York, in construing a similar option said: '':I think that the covenant was based upon a sufficient consideration, namely, the covenants on the part of the tenant, and that it obligated the defendants, if they wished to sell to another person during the term, to give the plaintiff the opportunity to take the property upon the same terms; in other words, that it required the defendants, after receiving the Keiser offer, to offer the property to plaintiff upon the same terms.''

In Hudson Amusement Company v. Smith, Ohio Com. Pl., 17 Ohio Supp. 123; Id. Ohio App., 65 N. E. (2d) 881, 882, there was a lease contract on a theatre building, with an option as follows: ''In the event Lessor decides to sell said Theater, and the building of which said Theater is a part, or receives an offer to sell said premises he shall notify Lessees in writing and Lessees shall have the first right to purchase said premises at the price fixed by Lessor, if they so elect. However, Lessees shall make such election within thirty days after they receive such written notice.'' The Ohio court unreservedly held that the lessees were entitled to receive the same terms as those offered by another prospective purchaser and that a notice to the lessees which failed to disclose those

terms and which exacted more difficult terms of the lessees was, in effect, no notice at all.

The majority opinion does not question the fact that appellee was entitled to the same terms of sale as were granted to Waldrup. Now, if he was entitled to those terms, he was also entitled to have them set out in the notice which was given to him on September 9, 1949. That notice is as follows:

"Carlton & Henderson
Attorneys at Law
Sumner, Miss.
"September 9, 1949

"Mr. J. H. Hambrick
"Sumner, Mississippi
"Dear Mr. Hambrick:

"Pursuant to the provisions of our lease contract dated the first day of January, 1949, of record in Deed Book 89, at page 361, of the records in the office of the Clerk of the Chancery Court of the Second Judicial District of Tallahatchie County, Mississippi, at Sumner, notice is hereby given that I have received a bona fide offer to purchase the property described in said lease at and for the sum of $109,000.00 and that I desire to sell the same at and for such price.

"You are requested, in compliance with the provisions of said lease, to give notice in writing to my attorneys, Carlton & Henderson, Sumner, Mississippi, within fifteen days of the date hereof of your desire to accept or reject said property and to exercise your right to purchase the same at and for said sum of money.

"Pursuant, further, to the terms of the aforesaid lease, this notice shall act as, and hereby is, termination of the aforesaid lease contract as of December 31, 1949.

"In view of the fact that the property will be sold, this is your instruction to use no further labor or material in the repair of the houses and other building on the premises.

"It will be appreciated if you are in a position to give prompt notice of your desires in the matter without waiting the passage of the full fifteen day period provided for by said lease.

"Very truly yours,
"/s/ Mrs. Charlotte Hines
"Mrs. Charlotte Hines.

"This does not include 'Lost 40' on which the price is $4,000.00."

Let it be observed that this notice advised appellee that Mrs. Hines had received a bona fide offer of $109,000 for the property and requested him to give notice to her attorneys, Carlton & Henderson, within fifteen days whether he desired to exercise his right "to purchase the same at and for said sum of money". He was informed that it would take cash money if he wanted to exercise his option. He was not told that Waldrup's offer was on terms of $10,000 down and $99,000 in deferred payments over a period of ten years. In fact, he was not told of any terms and was given to understand that he must produce $109,000 in money if he purchased the land. For most people that is quite a sizeable sum. The plain reason for the provision in the option which granted appellee fifteen days in which to determine whether he might desire to purchase was in order that he might have at least that much opportunity to arrange to raise whatever money was required of him. Mrs. Hines lived in Memphis, Tennessee. She came down to Sumner, Mississippi, and executed a detailed contract with Waldrup and then gave appellee this notice which informed him that he must deal with her attorneys; she did not want to be contacted and returned to Memphis and remained out of the county and out of the state so that appellee could not contact her, and demanded that his dealings be with her attorneys. The chancellor was certainly justified in believing appellee's testimony, which is as follows:

"Q. At the time the letter was delivered to you under date of September 10th, 1949, executed by Mrs. Charlotte Hines, did you have any conversation at all in regard to the sale of this property with one C. Sidney Carlton? A. I did.

"Q. Tell that conversation. A. I asked him would she give me any terms on it, or give any terms.

"Q. What was his response to that question? A. He says it was all cash.

"The Court: All cash? A. Yes, sir.

"Q. After that date did you have any conversation in regard to the sale of this property with Mrs. Charlotte Hines? A. No.

"Q. After this particular day did you ever have any conversation in regard to the sale of this property by accepting your option under your lease contract with Mrs. Charlotte Hines, with her attorneys C. Sidney Carlton or R. H. Henderson? A. I did.

"Q. With which attorney? A. Carlton.

"Q. What did Carlton tell you? A. I asked him about the terms, and did she give him any terms.

"Q. To clear up this matter—excuse me for interrupting—but do you remember the date that you had the second conversation with Mr. Carlton? A. Wednesday the 14th, I believe it was.

"Q. Do you remember the date that you received the letter, what day of the week September 10th was on? A. Saturday.

"Q. Was this the Wednesday following that Saturday? A. Yes, sir.

"Q. What was that conversation by Carlton? A. I just asked him would she give me any terms on that place out there, and he told me that we had an understanding as to the terms, what they would be, when we made the trade—the lease contract for the place.

"Q. Did he reiterate the terms? Did he tell you what those terms were? A. No. He said she told you it

would be cash, and there wasn't anything said about the terms at that time.

"Q. Is that all the conversation? A. He told me that he would call Smith Murphy and get him to call her and find out. . . .

"Q. After your conversation on September 14th with C. Sidney Carlton, did you have another conversation with Mr. Carlton or Mr. Henderson relative to the purchase, or exercising your option to purchase the land from Mrs. Charlotte Hines? A. I left out of his office and went down on the streets and met Henderson.

"Q. Did Henderson say anything to you in reference to your exercising your option to so purchase said lands? A. I asked would she give any terms, and he said she told him the day before it would be all cash. . . .

"Q. Thereafter did you have any conversation with either of the attorneys? A. Yes.

"Q. Do you know what that date was? A. It was on Monday following this Wednesday.

"Q. That was Monday following Wednesday? A. Yes.

"Q. Who did you have a conversation then with? A. Carlton.

"Q. Where was that conversation held? A. In that barber shop.

"Q. Was it held in the presence of anyone else? A. Yes.

"Q. In the presence of whom? A. William Tindall.

"Q. What did Mr. Carlton tell you at that time? A. He told me he had a talk with the lady himself, and she was offering to knock off,—that is, to put $7,500.00 in escrow, and fifteen days $2,500.00, and sixty days the balance of $32,700.00, and give me five years to pay the balance. That is as far as she could go.

"Q. Were you ever offered any other offer than that offer just mentioned? A. No.

"Q. After that date did you have a conversation with either C. Sidney Carlton or R. H. Henderson in regard to the sale of this Hines property? A. I don't think so.

"Q. On September 24th you executed a release, a copy of which is filed in this case designated Exhibit D. Did you have a conversation that day with Mr. Henderson or Mr. Carlton? A. No.

"Q. You went to their office and executed this release? A. Yes. Well, the only thing I had Mr. Henderson came down there and told me he wanted me to come up there and get that thing over with.

"Q. Mr. Henderson told you he wanted you—what date was that? A. Saturday.

"Q. Where was that conversation? A. It was on the street in front of the bank.

"Q. He says come on up there and get that thing over with? A. Yes.

"Q. What else did he say? A. He didn't want to have a lawsuit over it.

"Q. He said he did not want to have a lawsuit over it. Mr. Hambrick, have you at all times been financially able, ready and willing to accept your rights to purchase this property under the same terms as mentioned in the contract between R. I. Waldrup and Mrs. Charlotte Hines? A. I have.

"Q. Were you ever given that offer to so purchase those lands? A. I was not.

"Mr. Carlton: The records show we admit that. The answer admits that.

"Q. Why did you sign the release relinquishing your rights to accept this property?

"Mr. Carlton: If the Court please, the contract is the best evidence of that, and the instructions are recited therein.

"The Court: Overrule the objection.

"A. Well, I figured too short a term for the balance.

"Q. You mean to say you was not able to pay that $32,000.00. I would like for you to tell the Judge just

why you signed that release? Or, I might ask you this question: At the time Mr. Carlton was telling you about the terms of sale, did you believe that Mr. Carlton was telling the truth? A. Yes.

"Q. Did you rely on his statements at the time you executed this release? A. Yes.

"Q. Would you have executed that release if the same terms had been offered to you as were offered to R. I. Waldrup? A. No."

Mr. Carlton testified and detailed the negotiations between Carlton and Hambrick, as follows:

"Q. They were dictated by you as attorney for Mrs. Hines? A. Well, I couldn't say I dictated every word of the instruments.

"Q. Were they drawn by your law firm? A. They were all drawn in my office. The fact of the matter is I did most of the draftsmanship. I did all of it with possibly some suggestions from Mr. Henderson as to the exact wording. And as far as Exhibit D is concerned, I dictated that in the center of our three offices, with Mr. Breland standing by, and Mr. Henderson sitting at the typewriter, and as we went in, all three of us discussed the instrument. On the second page, the first paragraph, my first dictation was rather jumbled and Mr. Breland and Mr. Henderson re-worded that paragraph.

"Q. What instrument? A. The release. I personally either drew or supervised the drawing of all those instruments, that is, the instrument executed between Hines and Waldrup, being executed on September 9th and not filed for record until a month later, or more, October 24th.

"Q. During that time that instrument was in your office? A. Yes, Mr. Kellum, that instrument was in my office, and should have been filed some days earlier, but we just waited.

"Q. Mr. Carlton, at the time you had your conversation and told Mr. Hambrick about the offers of lease being on a five year basis, you had full knowledge of this

instrument which had theretofore been executed by defendant? A. I knew at all times.

"Q. Did you or not have full knowledge of the terms of sale between the defendant Hines and Waldrup at the time you were making the statement to Mr. Hambrick that the terms would be a five year period? A. Mr. Kellum, I never—

"Mr. Kellum: Your Honor, I want an answer.

"The Court: You answer yes or no, and then make whatever explanation you want.

"A. I can answer yes to all except the last part of the question.

"Q. At the time you were making your statements to Mr. Hambrick in regard to the facts that terms to him would not exceed a five year basis, did you or not have full knowledge as to the terms that were granted by Mrs. Hines to defendant Waldrup? A. Yes, sir. . . .

"A. Mrs. Hines and Mr. Waldrup executed on September 9th Exhibit E to the original bill of complaint, which I prepared myself. On September 9th I prepared for signature of Mrs. Hines Exhibit C to the bill of complainant, which is the letter identified, but this option would be at $109,000.00 as per the lease contract. Mr. Hambrick executed an acknowledgment of receipt of that in my office on that date. He asked me, as he testified on direct examination, would she give any terms. Her authority in the matter did not include the giving of any terms to Mr. Hambrick, and I so advised him, that as far as I was authorized to speak, he would have to pay cash, but if he desired to make an offer to Mrs. Hines different from that, I would be glad to submit it to her. The next conversation which we had I believe was on Wednesday following the 9th, the 10th. That would have been the 14th. Mr. Hambrick again asked me would Mrs. Hines give him any terms. I told him I would be glad to talk to Mrs. Hines and see whether she would give him any terms; that she had not given me any authority to give any terms because we didn't consider he was en-

titled to any terms, that the price to him was $109,000.00, but we would be glad to try to work out something so he could have the place. It made no difference to us. Mrs. Hines had the place and she wanted to sell it.''

It is shown in the record without dispute that neither of appellants nor their attorney ever advised appellee of the terms of the Waldrup contract. Mr. Carlton took the position that this was confidential information which he could not disclose without the consent of his client, Mrs. Hines, and the contract was deliberately withheld from public record until October 24, 1949. Mr. Carlton testified that it should have been recorded earlier ''but we just waited.'' Thus it appears that appellee was entitled to fifteen days time in which to determine whether he would exercise his option and purchase the property upon the terms which Waldrup had offered; those terms were withheld from him and, while the sands were swiftly running out of appellee's fifteen-day hour glass, he was stalled along by Mrs. Hines' attorney, with whom he had been directed to deal, with a contention that he had no authority to disclose the terms of the Waldrup contract and no authority to make any deal except upon a cash basis, but which position was generously changed later to an offer of $32,500 cash with balance in deferred payments over a period of five years, as against the Waldrup terms of $10,000 cash and balance in ten years. While all this negotiation was in progress and while appellee was without information as to the Waldrup terms, he was led up to September 24, 1949, when the last sand in his glass had run out and the jaws of the vise were clamped upon him. Had the truth of the Waldrup terms been disclosed to him, he could have easily met them for the record shows that he not only paid Mrs. Hines every dime that he owed her but he also deposited in court the sum of $10,000 in cash on the day he filed this suit, which was all that was needed to meet the Waldrup terms. The fraud which was perpetrated on appellee commenced on September 9, 1949, and was active throughout the

entire negotiations between the parties. The chancellor heard all the evidence and observed all the witnesses. He held that Mrs. Hines was duty bound to disclose to appellee the terms of the Waldrup contract, that the case "is shot through with fraud," and that all dealings by her were "unfair, particularly the dealings since September 9th up to the filing and signing of the instrument in which she undertakes to . . . get a release from any of her obligations to him under her original contract, which is null and void and a fraud upon the face of this testimony." I have no quarrel with the principle of law, and the only principle on which authorities are cited in the majority opinion that "Where the person defrauded after having knowledge of the fraud enters into a new contract concerning the same subject matter . . . he will ordinarily be regarded as having waived the fraud in the original transaction", but in my opinion this principle is not here applicable because it is undisputed that at the time of signing the contract of release appellee did not have knowledge of the fraud which had been perpetrated upon him.

The majority opinion seems to travel upon the theory that fraud cannot arise except by some willful misrepresentation and that it cannot arise from mere silence, but no law to that effect is cited, nor, indeed, can any be cited. As particularly applicable to the situation in this case, I call attention to two quotations from 23 Am. Jur. on the subject of Fraud and Deceit:

"Section 78. Duty to Speak.—The principle is basic in the law of fraud as it relates to nondisclosure that a charge of fraud is maintainable where a party who knows material facts is under a duty, under the circumstances, to speak and disclose his information, but remains silent. Situations evoking the duty of disclosure may arise in various ways in different cases. Generally speaking, however, in the conduct of various transactions between persons involving business dealings, commercial negotiations, or other relationships relating to property,

contracts, and miscellaneous rights, there are times and occasions when the law imposes upon a party a duty to speak rather than to remain silent in respect of certain facts within his knowledge and thus to disclose information, in order that the party with whom he is dealing may be placed on an equal footing with him. In such a case a failure to speak amounts to a suppression of a fact which should have been disclosed and is a fraud. As a matter of fact, in such circumstances a failure to state a fact is actually equivalent to a fraudulent concealment and amounts to fraud just as much as an affirmative falsehood."

"Section 80. Superior Knowledge or Means of Knowledge.—Knowledge that the other party to a contemplated transaction is acting under a mistaken belief as to certain facts is a factor in determining that a duty of disclosure is owing. There is much authority to the effect that if one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expediency of the bargain."

These authorities are quite fitting here. Mrs. Hines and her attorneys were under duty to speak and disclose to appellee the Waldrup terms; they had the information and they knew that appellee neither had it nor had the means of obtaining it and yet they not only remained silent but deliberately withheld the Waldrup contract from record so that appellee could not obtain it. By suppressing the truth they perpetrated upon appellee just as unconscionable a fraud as they could have by an affirmative falsehood, and by the very authority which

the majority opinion cites, appellee did not waive this fraud because when the hot iron was applied to him and he executed the release he did not have knowledge of the fraud which had been and was then being perpetrated upon him. In my opinion the decree is abundantly supported both by the evidence and by the applicable law.